577 A.2d 419

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ANTHONY TYRONE MCDOUGALD, DEFENDANT-APPELLANT.

Argued January 3, 1990—Decided July 12, 1990.

528

*Tina R. Boyer* and *Claudia Van Wyk*, Assistant Deputy Public Defenders, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney; *Tina R. Boyer, Claudia Van Wyk,* and *Mark H. Friedman,* Assistant Deputy Public Defender, on the briefs).

*Marijean Raffetto Stevens,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

Defendant, Anthony McDougald, was convicted by a jury of the brutal murders of Walter Bass and his wife, Maria Bass, and sentenced to death. He appeals directly to this Court as of right. *R.* 2:2–1(a)(3). We affirm defendant's convictions for

murder. We set aside the death penalty, however, based on an erroneous charge regarding *N.J.S.A.* 2C:11–3c(4)(c), and remand the matter to the trial court for a new sentencing proceeding.

## I. FACTS

Anthony McDougald faced trial, pursuant to a thirteen-count indictment, for the murders of Walter Bass and Maria Bass, and related crimes. The jury found McDougald guilty on all counts, and sentenced him to death. McDougald does not dispute his participation in the murders. Following is an account of the essentially undisputed facts surrounding this case.

### A. Events Preceding the Murders

Walter and Maria Bass resided in Newark with Maria's natural daughter and Walter's stepdaughter, Antoinette James. The family first met and befriended Anthony McDougald sometime between 1982 and 1983 at the home of their then-downstairs neighbor and mutual friend, Arlene Euggey. The family continued its friendly relationship with McDougald even after it moved to 14 Bedford Street in Newark in the early months of 1984. Antoinette became romantically involved with McDougald shortly thereafter. Antoinette was thirteen years of age, and McDougald was twenty-seven. They began having sexual relations in February of 1984.

During this time, McDougald was living in an apartment at 69 Somerset Street in Newark with Bernice Simmons. He had married Bernice in January of 1983, apparently without first having divorced his prior wife. In addition, McDougald was also romantically involved with a woman named Marilyn Howard, whom he also had met through Arlene Euggey. During the early months of 1984, defendant was often away from home on weekends. He explained to Bernice that he was drinking with the Basses during these absences.

In April of 1984, Antoinette James informed her mother and McDougald that she believed she was pregnant with McDougald's child. When a subsequent pregnancy test proved nega-

tive, Antoinette was too embarrassed to admit her mistake. Instead, she told McDougald she had had an abortion. She never gave her parents any explanation. Presumably the Basses continued to believe that until the date of their deaths she was pregnant.

The relationship between defendant and the Basses turned hostile once they discovered that McDougald was having sexual relations with their daughter. Mrs. Bass forbade her daughter from seeing McDougald. Nevertheless, Antoinette defied her mother and continued her sexual relationship with McDougald. Maria Bass then apparently threatened McDougald with filing statutory-rape charges against him. He responded by telling Antoinette he would "get" her parents "one way or the other."

Defendant indicated his concern regarding the possibility of the Basses filing rape charges against him to two persons during that spring and early summer. In May of 1984, he told Bernice Simmons that Antoinette was pregnant with his baby and that "the Basses had threatened to press charges against him for statutory rape." He also told Marilyn Howard, sometime during June or July, that Maria Bass had pressed charges against him for having engaged in sexual relations with her daughter.

In May Bernice Simmons gave birth prematurely to the couple's child, a boy. Apparently McDougald was very attentive to the child. He visited the hospital frequently, purchased supplies for the baby, and acted as a reliable phone contact for the hospital.

There were several altercations between defendant and the Basses during that late spring and early summer. On two such occasions Maria Bass called the police. On the evening of June 10th, defendant went to the Basses' home to see Antoinette. When they refused to allow him in, he kicked in the front door. Maria Bass called the police, and Officer Henry Moore responded. By this time defendant had left, but the officer took a report on the incident from Maria Bass.

On the evening of June 17, 1984, Maria Bass granted Antoinette permission to go out to the movies with McDougald, instructing her to be home by 10:30 p.m. After the movie, McDougald and Antoinette engaged in sexual relations. Antoinette did not return home until 2:30 a.m. After he took Antoinette home, defendant heard Mrs. Bass, from outside the apartment, scold and slap Antoinette. He again kicked in the front door. On this occasion he pushed Maria, hit Walter, and took Antoinette to the home of her natural father. Again Maria called the police, and this time Officer Ralph Boswell responded and took a report.

After this last incident, defendant arrived at the home he shared with Bernice in the early morning hours of June 18th. Later that morning, he explained to Bernice that he had had a fight with the Basses. He expressed anxiety about their pressing rape and burglary charges against him. He told her he believed that the police were looking for him in relation to the incident.

In July, McDougald's baby was discharged from the hospital. Bernice took him to South Carolina. She told McDougald that she was only visiting relatives. In reality, Bernice had moved to South Carolina with the intention of remaining there permanently, thus severing her relationship to McDougald.

### B. The Murders

McDougald was the source for many of the details surrounding the crimes. His statements and admissions were virtually uncontested at trial. The series of events that culminated in the murders began on the evening of August 18th sometime before 11:30 o'clock. McDougald started a fire on his bed in his apartment. He purportedly wanted to obliterate the bad memories he associated with the premises. McDougald was distraught over his failed marriage to Bernice. He enlisted Michelene ("Kisha") Williams, a thirteen-year-old girl, with whom he apparently was romantically involved, to help burn the bed. He

then called his mother at her residence in the Newark YMCA and, along with Kisha, told her of having set the bed on fire.

Later, at approximately 2:00 o'clock on the morning of August 19th, defendant and Kisha Williams arrived at the home of the Basses. McDougald, by his own admission, was armed with a knife and may also have been carrying a baseball bat. Although McDougald claimed to have found the baseball bat in the home, Antoinette testified that the family did not possess such a bat. McDougald kicked open the front door and entered the bedroom where the couple was sleeping with Arlene Euggy's two-year-old son whom they were watching.

Defendant awakened Walter Bass and ordered him to come into the other room. Walter requested time to put on his pants, but defendant refused to allow him to do so. Defendant then asked where Antoinette was, and Walter responded truthfully that she was staying at a cousin's home that night. The three of them then proceeded into Antoinette's bedroom, where Mr. McDougald repeatedly asked "why was they trying to hurt [him], why?", saying "I never did anything to hurt you" and "I only tried to help you." Walter Bass responded "I'm sorry," at which point, defendant described the incident as follows:

> I then cut him across his throat with a knife and he told me: "Tony, don't." Then I stabbed him in the chest. I was holding his neck with my hand. Then I think I stabbed him again two times. He fell on the floor. I told Kisha to watch him.

Defendant proceeded into the bedroom where Maria Bass and the infant were sleeping. Kisha called him back, however, because Walter had begun crawling from the back bedroom toward the kitchen. This is when Mr. McDougald claims to have found a bat in the apartment, which he used to "hit Walter Bass on the head * * *. He was on his knees and he fell back to the floor." Returning to Maria's room, defendant heard Walter moaning, and heard Kisha saying to Mr. Bass, "What did you do to Tony?" McDougald then heard Kisha hit Walter three more times with the bat.

Kisha then went into the room where defendant was standing over the sleeping Maria and the baby. McDougald asked her if Walter was dead, and she answered affirmatively. McDougald claims that Kisha then stated she "wanted to help with Maria." McDougald sent Kisha back to get the bat. He asked her if she was sure she wanted to participate, and then moved the baby away from the bed and instructed Kisha to hit Maria with the bat. Maria moved to get up. Defendant described his subsequent actions:

> I went and got a cinderblock that was in the house and I hit her in the head with it. Maria moved again. Then I hit her with the bat once. Then I took the knife out of Kisha's hand and cut Maria's throat.

Defendant then sliced the bra Maria Bass was wearing in half with the knife, pulled her underpants down onto one ankle, and inserted the bat approximately three inches into her vagina, saying, "That's for having Antoinette." McDougald and Kisha then left the Basses' apartment.

McDougald called his mother again. This time he informed her that he had killed two persons. He also asked her if he could borrow forty dollars to get a place to stay. Ms. McDougald told him to come over.

Kisha Williams accompanied McDougald to the YMCA. Ms. McDougald came out, and the group sat on the stoop of a nearby church discussing the night's events. McDougald confirmed in his statement to police that he told his mother at that time that he wanted to kill three other persons as well. They were Antoinette James ("because it was her fault my wife took my son"), and Jean Simmons and Charlie Simmons, Bernice's sister and brother ("because they talked my wife into leaving me and taking my son."). As he was leaving the YMCA, defendant encountered Marilyn Washington, a neighbor and friend of his mother. He told her that he had killed two people and asked her to check on his mother because she was upset.

After leaving his mother, defendant traveled to Washington Park, close to the YMCA. At 3:26 o'clock that morning defendant made a phone call from the park. AT & T operator Betty

Upchurch received the call from a male, later confirmed to have been McDougald, who stated: "Operator, you had better get someone up there 14 Bedford Street, there are two people dead there. I just killed them and—." Ms. Upchurch interrupted, said "hold on," connected McDougald with the Newark police, and hung up. When Communications Clerk answered and announced to the caller that he was now speaking to the Newark Police, McDougald suggested that someone go to 14 Bedford Street, where there were two dead bodies and a healthy baby. He told him that he had killed the two people, and that their identities were Walter and Maria Bass. McDougald then hung up.

Defendant claims to have thrown away the knife in a vacant lot sometime later that morning and to have left his bloodied shirt at a friend's home. Police searched the lot and attempted to locate the shirt, but neither item was ever recovered.

## C. The Investigation

Patrolmen Marvel and his partner went to the Basses' apartment in response to McDougald's telephone call. When the officers arrived, they heard a baby crying, noticed that the door was ajar, entered the apartment, and discovered the bodies of Walter and Maria Bass. Subsequently Detectives Conti and Eutsey from the Homicide Unit arrived. With the assistance of Detective Smith from the State Police, the officers secured the premises, conducted a search, collected evidence, and photographed the apartment and the bodies. Later that morning, Detective Eutsey played the recorded phone call for a neighbor of the Basses also acquainted with defendant, and Antoinette James. Both identified the voice as that of Anthony McDougald.

Detective Eutsey then went to the YMCA during the afternoon of the 19th to speak to Shirley McDougald. She accompanied him to police headquarters and gave a statement regarding the incident implicating her son. Later that evening Detective Eutsey went to 69 Somerset Street looking for defendant and

discovered that there had been a recent fire at the premises. Based on information that he subsequently received from an informant, he arrested Kisha Williams on August 20th.

Detective Eutsey returned to police headquarters with Kisha Williams. Shortly thereafter, he received a call from Shirley McDougald, reporting that her son would turn himself in to police. A short time later, defendant called. McDougald inquired whether Kisha was in custody and stated that he would surrender at police headquarters. McDougald and a young woman by the name of Ethel Lewis met Detective Eutsey in the lobby of police headquarters a short time later. He was then advised of his *Miranda* rights. After his mother arrived and he had spoken with her, McDougald expressed some willingness to make a statement. Once more, McDougald was advised of his rights. He gave a statement concerning the events of August 19th, which detailed Kisha's and his involvement in the crimes. The red rayon pants he was wearing at the time of the interview were the same he had worn the previous night, and were confiscated as evidence.

### D. Procedural History

#### 1. *Pretrial Proceedings*

On September 19, 1984, the State filed a thirteen-count indictment charging defendant with: the purposeful or knowing murders of Walter Bass and Maria Bass by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(1) or (2) [counts I and II]; felony murder of Walter Bass and Maria Bass contrary to *N.J.S.A.* 2C:11–3a [counts III and IV]; two counts of second degree burglary, committed on June 18, 1984, and August 19, 1984, contrary to *N.J.S.A.* 2C:18–2 [counts V and XIII]; unlawful possession of weapons and possession of weapons for an unlawful purpose (a knife and a bludgeon) contrary to *N.J.S.A.* 2C:39–5d and 2C:39–4d [counts VI and VII]; third degree hindering prosecution or apprehension contrary to *N.J.S.A.* 2C:29–3b(2) or (3) [count VIII]; second degree attempted murder of Antoinette James, contrary to *N.J.S.A.* 2C:5–1 and *N.J.*

*S.A.* 2C:11–3 [count IX]; second degree aggravated arson contrary to *N.J.S.A.* 2C:17–1a(1) or (2) [count X]; second degree sexual assault upon Antoinette James, contrary to *N.J.S.A.* 2C:14–2c(5) [count XI]; and third degree burglary, on June 10, 1984, contrary to *N.J.S.A.* 2C:18–2 [count XII].

The State served notice of its intent to prove three aggravating factors: *N.J.S.A.* 2C:11–3c(4)(c), that the murders of Walter Bass and Maria Bass "involved torture, depravity of mind, or an aggravated battery to the victim[s]"; *N.J.S.A.* 2C:11–3c(4)(f), that the murders were committed to escape detection or prosecution for other offenses committed by defendant; and *N.J.S.A.* 2C:11–3c(4)(g), that the murders were committed in the course of a felony.

Defendant made numerous pretrial motions. In summary, those motions and their dispositions were as follows: to adjourn the case pending the new *Biegenwald* (denied); to strike factor c(4)(c) as unconstitutionally vague (denied); challenging the composition of the Grand and Petit Jury list in Essex County (consent order filed June 28, 1985, joining and incorporating the *Ramseur* record); motion to bar death qualification of the jury (denied); motion to dismiss the indictment based on the unconstitutionality of the Capital Punishment Act (denied); motion to strike aggravating factors c(4)(f) and c(4)(g) as cumulative (consent to adjournment pending factual development); and finally a motion to strike c(4)(c) as inapplicable to the developing facts of this case, particularly regarding the killing of Maria Bass (denied without prejudice). Additionally, it was agreed that the court would conduct the initial voir dire with each side then asking supplemental questions, and that the parties would submit proposed questions to the court.

The parties agreed to use substantially the same *voir dire* procedure and questions that the trial court had employed in *State v. Rose,* 112 *N.J.* 454, 548 *A.*2d 1058 (1988). The court would request that the venire members fill out a written questionnaire. The court would first question the venire mem-

bers, and the attorneys would then question them. The defense proposed a list of questions for the court to ask and submitted a list of areas they sought to cover themselves through direct questioning. One such area was potential racial bias.

After the *voir dire* questioning, the trial court convened the death-qualified jurors, and the attorneys exercised peremptory challenges until a final jury was chosen. The State and the defense both exhausted their allotments of peremptory challenges. At the conclusion of that process, the defense moved for a mistrial, asserting that although somewhere between five and eight African–American persons remained on the jury, the prosecutor had exercised ten challenges to excuse African–American jurors and one to excuse a Latino juror. The defense maintained it had therefore made a prima facie showing that the prosecutor had employed discriminatory challenges systematically to exclude members of an identifiable group.

The State responded that it had challenged only those African–Americans who had expressed a reluctance during voir dire to enforce the death penalty. The court considered that a legitimate reason for the challenges. The court also rejected the argument that systematically excluding persons·who possess some reservations about the death penalty was also invalid because it contravened the defendant's right to a jury comprised of a fair cross section of the community.

A *Miranda* hearing to determine the admissibility of defendant's statement of August 20, 1984, resulted in an unchallenged finding of admissibility.

Defendant also moved to preclude the State from informing the jury of the age of McDougald's accomplice, Kisha Williams, asserting that it was immaterial to the State's case and further that any probative value was "far outweighed" by the prejudice such knowledge would cause defendant. The State responded that the accomplice's age was admissible evidence, as it related to proof that defendant committed knowing and purposeful acts by his own conduct, and that it was McDougald who enlisted

this young woman to accompany him. The court agreed that it was a relevant fact, and further held that its probative value was not outweighed by the risk of undue prejudice. An interlocutory appeal on this issue was unsuccessful.

### 2. *Trial—Guilt Phase*

Given the admissibility of defendant's confession, the State's proofs during the guilt-phase of the trial were essentially directed at corroborating the facts to which defendant himself had confessed. Also, the State's evidence addressed defendant's fear of prosecution for his sexual relationship with the Basses' minor daughter and his forceful entrance into the Basses' home. The State sought to characterize McDougald's apprehension at the possibility of being prosecuted as his motive for the murders of August 19th.

In its opening to the jury, the defense conceded McDougald's guilt of the numerous offenses. The defense stated:

\* \* \* \* \* \* \* \*

> Often ... I can deny that my client was involved. I can deny that he did essentially what the Prosecutor said he did. But, unfortunately in this case, ladies and gentlemen, unfortunately for the defense and Mr. McDougald we can't deny it in this case because essentially, and I say essentially because perhaps not completely, essentially the facts as presented to you by the Prosecutor are what happened that morning.... But, again we urge you to keep an open mind because this case is about more than guilt or innocence. It is about whether or not Mr. McDougald lives or dies.

\* \* \* \* \* \* \* \*

The defense maintained this tactical posture of admitting McDougald's guilt throughout the guilt phase of the trial. The defense conducted virtually no cross-examination of the State's witnesses and proffered no evidence.

The State presented photographs and witnesses describing the discovery and condition of the decedents at the scene, the evidence found, and the investigation. The officers involved in the case who testified for the State detailed a scene that corroborated Anthony McDougald's account. Officer Marvel, along with his partner first on the scene, testified that they had

arrived at 14 Bedford Street at approximately 3:55 a.m. and found the front door broken open, a male decedent lying on the floor of the kitchen up against a wall, and a female decedent and crying infant in the front bedroom.

Detective Conti described how he and Detective Smith, a crime-scene technician with the State Police, diagramed, searched, and photographed the premises, and collected the evidence. The State presented various crime scene photographs, in conjunction with Detective Conti's testimony. Those photographs showed the victims, the broken lock on the front door, the bedroom, and the kitchen. Detective Conti also identified a baseball bat, bedsheets, brassiere, and cinderblock, as materials found on the scene. He also identified the maroon pants as those taken from defendant on the morning of August 20th.

Detective Eutsey testified to the steps he took in identifying and locating defendant, much of which has been set out above. After authenticating the statement made to him by defendant on August 20th, the Detective read that statement to the jury.

A captain of the Newark Fire Department testified that he responded to a fire at 69 Somerset Street at approximately 11:30 p.m. and extinguished a fire in the bedroom of the first floor apartment. Officers Moore and Boswell told the jury about their response to Maria Bass' calls on June 10th and June 18th, respectively.

Chemists from the State Police Laboratory testified, based on their analysis of the forensic evidence and blood and enzyme comparisons, that the sheet and pillowcase found in the front bedroom showed stains of blood consistent with that of Maria Bass. Also, the cinderblock and bat had traces of human blood, and the maroon pants taken from the defendant had tested positive for human blood consistent with either or both victims. A red rayon fiber recovered from the bedsheet "compared physically and chemically" with the pants defendant was wearing at the time of his arrest.

Dr. Melczer, from the Essex County Medical Examiner's Office, outlined the findings of his autopsy examinations of the victims' bodies. Dr. Melczer explained that both victims had suffered two distinct sorts of injuries; those caused by stabbing and those caused by blunt force. Walter Bass had two fatal stab wounds to the left side of his chest, as well as superficial stab wounds to the abdomen and neck. He also suffered serious head injuries caused by a blunt instrument. His left ear was completely crushed, and his skull was fractured on both sides of his head. The doctor posited that both the stab wounds and blows to the head were capable of causing the victim's death. In Dr. Melczer's opinion Walter Bass had survived for about ten to fifteen minutes. Maria Bass had multiple blunt-force injuries to the head, which crushed her skull and were determined to be the cause of her death. Her left ear was crushed and the skull underneath fractured like an egg shell. Additionally, there was a deep slash to her neck and a baseball bat protruded from her vagina. Dr. Melczer said that Maria Bass lost consciousness within a few minutes but survived for five to ten minutes.

That testimony was supplemented by clinical photographs of the decedents, taken at the police laboratory. The defense strenuously objected to the introduction of those photographs, alleging that they were highly prejudicial, repetitive of the previously-introduced crime-scene pictures, and again unnecessarily enlarged. Although the State was precluded from offering the enlargements of the photographs, most of them nonetheless were ruled admissible.

Antoinette James, Bernice Simmons, and Marilyn Howard, all involved romantically with defendant during the months prior to the crimes, testified for the State. They described McDougald's evolving relationship with the Basses, his belief that the Basses had filed criminal charges against him, and his altercations with them.

Although no objections to the jury charge are recorded, attorneys for defendant had previously argued that the trial court should omit language permitting a guilty verdict to capital murder based on a finding that defendant intended to cause serious bodily injury to his victims. The court denied that request.

The defense also had requested that the trial court reiterate the distinction drawn under the capital statute between murder by "one's own conduct" and as an accomplice, specifically that "something more is required than that the defendant aided and abetted in the murders." To this end, the defense requested a charge that the jury had to find beyond a reasonable doubt that it was the batteries inflicted by Anthony McDougald that had caused the victims' deaths before it could convict him of knowing and purposeful murder by his own conduct. The defense asserted that if it was a combination of several persons' blows or the jury could not ascertain which injuries caused the deaths, McDougald could not be found guilty of these counts.

The trial court held that the causation issue was one of fact for jury resolution. With respect to the related accomplice issue, a verdict sheet was prepared in which a finding of knowing and purposeful murder triggered a choice between two options. The jury could find that either the killings were committed by defendant's own conduct or he was an accomplice in the murders.

The jury returned a verdict of guilty on all counts, except count ten of which defendant was found guilty of the lesser-included offense of third degree arson. The homicides were found to be committed by defendant's own conduct.

### 3. *Trial Penalty Phase*

The State sought to prove three aggravating factors with respect to each killing: c(4)(c), that the murders involved torture, depravity of mind, or an aggravated battery; c(4)(f), that the murders were committed to escape detection or prosecution for other offenses; and c(4)(g), that the murders were commit-

ted in the course of a felony. The State relied on the evidence adduced at the guilt-phase and presented rebuttal evidence.

The defense countered by asserting three mitigating factors equally applicable to each death: c(5)(a), that defendant's conduct was motivated by an extreme emotional disturbance; c(5)(d), that defendant's self-control was diminished by a mental defect; and c(5)(h), any other factor relevant to defendant's character or record or to the circumstances of the offense.

The defense sought to portray Anthony McDougald as a product of a violent and deprived youth whose severe despondency over the loss of his wife and newborn son caused him to lose self-control. As portrayed by the defense through the testimony of persons who knew McDougald, the ultimate acts of violence on August 19th were the product of a deprived background and of recent precipitating events.

Karen Vogel, a social worker in the intensive care nursery at Beth Israel Hospital, testified that after the baby's birth, Anthony McDougald was very concerned and anxious about the condition of his son. McDougald spent a good deal of time at the hospital. He apparently became very attached to the child, who was in a ventilator.

Shirley McDougald also testified about McDougald's attachment to his newborn son. She stated that when her son discovered Bernice Simmons was not going to return with the baby, he became extremely upset. He came to her crying and enlisted her help in trying to coax Bernice back by having her repeatedly telephone South Carolina asking to speak to Bernice. These efforts were unavailing, however. She also told the jury that after Bernice left, her son "just let his self go," was all "wound up" and could not manage to "keep still."

As the weeks went by that July, defendant was presented as becoming increasingly depressed over his separation from Bernice and the baby. Ms. McDougald testified that late in July, defendant appeared at the YMCA and demanded she get Bernice and the baby back, charged that she was responsible for

Bernice leaving, attempted to assault her, and tore up her room. She also testified that a friend called her later and told her that her son was at the friend's home "lying on the floor crying saying he wanted to talk to his mother." She refused to speak with him.

William Campbell, a friend of McDougald, testified that presumably on this same day late in July he observed defendant leaving 20th Street in Newark, apparently the residence of his "ex-wife" Linda Harper, crying and driving his car erratically up and down the street, finally running it head on into a brick wall. He suffered only minor injuries, a "busted" lip, and reportedly then got out of the car and said to Mr. Campbell and his wife, "Damn it, I can't even kill myself."

Debra Ann Jones, an intake coordinator at the substance-abuse program at Mt. Carmel Guild Catholic Community Service Center testified that on July 26, 1984, defendant went there seeking help. He sat with his head between his knees as he told her that he needed help, that he was having a lot of problems, including his wife leaving him, and that he had tried to commit suicide. He said that he did not take drugs, but instead that his problem involved his mental health. Consequently, he was referred to another counselor in the psychiatric unit, but apparently left the facility without seeing anyone else.

On this same day, defendant phoned his mother at her residence at the YMCA on Broad Street in Newark and asked her to meet him outside in nearby Washington Park. She and a friend, Debra Wilder, met Mr. McDougald in the park. Debra Wilder and Ms. McDougald both testified that he told them that he thought he was losing his mind and had sought help at both Mt. Carmel Guild and College Hospital but was turned down. He looked scared and nervous, responded affirmatively to questions about using drugs, and expressed his belief that someone was following him. He accompanied the two women to Ms. McDougald's place of employment.

Fearful that her son might be committed if he continued to seek help at a hospital, Ms. McDougald took him to see a "root doctor" later that day. That person prescribed oils to put in Bernice's clothes to bring her back, candles and pills, and instructed McDougald to repeat the Twenty–Third Psalm in a chant-like manner. McDougald was supposed to follow this regimen for seven days, but returned earlier for further help. Shirley McDougald testified that at that time defendant said he was taking drugs because he was having trouble sleeping, and was upset because "Bernice is gone; Antoinette is gone and my brother is dead. I don't have anything to live for."

Defense witness Donald Winston, a friend of defendant, corroborated McDougald's efforts to be helped by this "doctor." He told the jury that he went to defendant's apartment one night in early August and found the lights out, ten to twelve candles burning, and defendant in the bedroom saying some kind of chant. Mr. Winston also testified that he witnessed defendant sitting on his bed staring aimlessly into the crib beside it. When Mr. Winston inquired about a broken television in the apartment, McDougald told him that he had gotten upset and kicked it in.

After the trips to the root doctor, Ms. McDougald testified that she was not in contact with defendant for several weeks, and next heard from him on in the early evening of August 18th, when he came to the YMCA and borrowed ten dollars from her. Later he called her and told her about the fire he had set. In her statement to Detective Eutsey, she stated that her son explained to her that he was "burning up memories," that "his wife had left him and took his baby with her and Antoinette's mother was trying [to] put him in jail for rape and assault and he was at the bottom of his life—he was at the bottom, his life was over." Ms. McDougald did not believe her son, so a young woman, presumably Kisha Williams, got on the phone with Mr. McDougald and confirmed the defendant's story adding that she had helped. He also apparently told her during

this conversation that "they found my brother's body at 2:00 or 2:30 in the morning and they will find mine the same time."

Ms. McDougald testified that later, in the early hours of August 19th when Kisha and McDougald came to see her, they both appeared "high" and left her when Kisha whispered to her son that she wanted to "get some stuff to get high with."

Ms. McDougald also testified extensively about defendant's childhood. She was single when defendant was born, and shared a four-room house with her parents and sister in North Carolina. She told the jury of instances during McDougald's infancy when her sister, apparently angry with her, burned and cut the child. In one instance, when the two sisters were having a fight, McDougald's aunt grabbed the child and cut his face with a razor blade, from the mouth to the ear.

Ms. McDougald left Anthony McDougald and his younger brother with her parents for two years while she came to Newark to work as a live-in maid. When the boys were later brought to New Jersey to live with their mother and her boyfriend in a drug-infested area of Newark, they once more were subjected to abuse. Ms. McDougald's boyfriend hit the children "more than ... most parents beat their kids." The children also had to watch their mother be repeatedly beaten. Ms. McDougald labeled her son a "hyper" child who got into fights. He had once perched on the school roof and threatened to jump off.

Finally, Ms. McDougald told the jury how Anthony McDougald's close relationship with his brother ended abruptly when his brother was thrown off a bridge onto the Garden State Parkway and killed sometime in 1983.

Ms. McDougald testified that her son had never been violent with her, or threatened her except in July of 1984. On cross-examination, the prosecutor asked whether Anthony McDougald had threatened to kill his mother if she did not give him some of the insurance proceeds on his brother's life to buy a car. Ms. McDougald admitted that he wanted some of the money but

denied that he ever threatened her. She also testified on cross that her son told her he killed the Basses because he "wasn't going to jail for no rape because he didn't rape anybody."

The State called four rebuttal witnesses. Marilyn Washington and Detective Eutsey refuted the assertion that defendant was under the influence of alcohol or narcotics on the night of the murders.

Ms. Washington, another resident of the YMCA and friend of Mrs. McDougald, testified that as she was returning home from work sometime after 3:00 a.m., she encountered defendant and a young woman in the hallway of that building. McDougald asked Ms. Washington to check on his mother, explaining that she was upset. He also related, to Miss Washington's disbelief, that he had killed two people that night. The prosecutor implied that Ms. Washington was sensitive to persons who were intoxicated due to her background as a special police officer working security in bars. Then he elicited her opinion that after approximately a five-minute conversation, defendant did not appear to her to be intoxicated in any way.

With respect to the issue of intoxication, Detective Eutsey was recalled to testify that Ms. McDougald never stated during her declaration to the police on August 19th that her son was high when she saw him on the morning of the murders.

The State called Officer Foster to contradict William Campbell's assertions that McDougald's suicide attempt had been severe. Officer Foster had responded to the scene of that car accident on July 29, 1984. Officer Foster testified that the car was found resting against the side of a building. The car had not hit head on but had sideswiped the building. The damage to the car was confined to the left front fender. That testimony was supplemented by photographs of the damaged car.

The State also called Bernice Simmons to rebut the assertion that Anthony McDougald "changed" after she left with the baby. Ms. Simmons testified on direct examination that she left because she "was tired of his manipulations, his lying, his

deceiving and ... tired of his threats against me and my family." She also stated that she believed her safety and that of the baby were in jeopardy. She said that during the course of their relationship defendant had threatened to harm her on numerous occasions, that he had also threatened her brother and sister, and that he had said to her that he would kill his mother because she would not share the life insurance proceeds paid on his brother's death. Ms. Simmons told the jury she lied about her intention to return because she feared that otherwise he would not let them leave. On cross examination, however, Ms. Simmons confirmed that in a statement given to an investigator from the prosecutor's office previously she had said she left because the defendant was "get[ting] on [her] nerves" and because he was blaming her for Antoinette's pregnancy.

A series of cross and redirect examination ensued, culminating in a mistrial motion and the basis of arguments on appeal. The focus of the questioning turned to the threats made by defendant to Ms. Simmon's brother and sister. On recross, the defense brought out the fact that Ms. Simmons had married defendant *after* he had threatened to harm these relatives. The prosecutor responded by asking Ms. Simmons why she had married defendant, to which she answered that she was afraid of him and afraid not to marry him, "because he had told me before that he had charges against him for rape when he was in Japan." The defense promptly moved for a mistrial based on the disclosure of that information, which was denied. Counsel then debated when and if the judge should give the jury a cautionary instruction regarding consideration of that material. Over fervent objections that an instruction would merely highlight prejudicial facts, the trial court charged the jury that it could consider the testimony regarding Japan for the limited purpose of assessing Bernice Simmons credibility and the reason she gave for marrying Anthony McDougald.

In summation, the defense asserted that their client was a man suffering from mental defects who had killed in a frenzy and who would be adequately punished by spending the remain-

der of his life in Trenton State Prison. The prosecutor responded by asserting that no evidence of mental disease had been presented, that defendant was not sick but merely a criminal. The prosecution stated that sending such a remorseless man to Trenton State Prison would make that facility "a bigger hell." The court overruled defendant's objection that this reference to the prison was an allusion to a nonstatutory aggravating factor.

In charging at the penalty phase, the trial court explained the respective burdens of proof, the need for the jury to find the existence of aggravating factors beyond a reasonable doubt and also to find that those aggravating factors outweighed the mitigating factors beyond a reasonable doubt. It also explained that the aggravating factors had to be found to exist by all jurors, but that they did not have to be unanimous in finding the existence of any mitigating factors. Further, the court charged the jurors that a nonunanimous verdict was acceptable, and that in that event defendant would be sentenced for each murder to a life term with a thirty-year parole disqualifier.

The jury found all three aggravating factors, found two mitigating factors, emotional distress and the "catch-all" factor, and that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Further, the jury found that factors c(4)(c) and c(4)(f) individually outweighed the combined mitigating factors, but that factor c(4)(g) did not independently outweigh the mitigating factors. Accordingly, the trial court sentenced Anthony McDougald to death. On the noncapital counts, the defendant was sentenced to forty years with twenty years parole ineligibility. A motion for a judgment of acquittal on all counts and a motion for a new trial were denied.

## II. CONSTITUTIONAL CHALLENGES TO THE STATUTE

Defendant contends that *N.J.S.A.* 2C:11–3c(2) is unconstitutional because it allows the State to present evidence that lies outside the rules of evidence in order to rebut other such

defense evidence. This result, defendant argues, injects unreliable information into the capital sentencing decision in violation of the eighth amendment of the federal constitution and article I, paragraphs 1 and 12 of the state constitution.

*N.J.S.A.* 2C:11–3c(2)(b) provides in part:

If the defendant produces evidence in mitigation which would not be admissible under the rules governing the admission of evidence at criminal trials, the State may rebut that evidence without regard to the rules governing the admission of evidence at criminal trials.

The Act narrowly permits the State to exceed the scope of evidentiary rules to rebut evidence presented by the defense that also falls outside the evidentiary rules.

The Supreme Court noted in *Gregg v. Georgia,* 428 *U.S.* 153, 190, 96 *S.Ct.* 2909, 2933, 49 *L.Ed.*2d 859, 884 (1976) that "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." In order to ensure that the jury imposes death only when the individual defendant is deserving of the punishment, the defense is allowed to introduce evidence in the penalty phase, that lies outside the rules of evidence. The State, however, should also be permitted to rebut under the same terms. Otherwise the defense could present a distorted view of defendant to the jury. The New Jersey Capital Act strikes the necessary balance between the prosecution and the defense in order to attain the goal of individualized justice in the capital penalty context. Hence, we conclude that *N.J.S.A.* 2C:11–3(2)(b) is not unconstitutional under the federal and state constitutions.

## III. JURY SELECTION ISSUES

Defendant presents four issues regarding jury selection. First he argues that the Grand and Petit Jury Systems in Essex County are unrepresentative of the population in violation of the United States Constitution and the New Jersey Constitution. We rejected that argument in *State v. Ramseur,* 106 *N.J.*

123, 212–38, 524 *A*.2d 188 (1987), and continue to adhere to that position.

The remaining issues are: (1) that the trial court failed to question potential jurors about possible racial prejudice in violation of the federal constitution and the New Jersey Constitution; (2) that the State exercised its peremptory challenges systematically to exclude minority and female jurors in violation of the federal constitution and the New Jersey Constitution; and (3) that the trial court failed to excuse a potential juror who strongly favored capital punishment and could not assure the court that he could be impartial. We also reject those challenges for the reasons explained below.

### A. *Voir Dire* Inquiry on Racial Prejudice

■ Defendant argues that the trial court limited inquiry into potential jurors' racial attitudes to a single "oblique" question that failed to reveal prejudice. That ruling, defendant maintains, interfered with the intelligent exercise of excusals for cause and peremptory challenges and created an impermissible risk that racial prejudice infected the proceedings.

The *voir dire* procedure in this case developed as follows. First, the trial court read the indictment and briefly instructed the venire panels regarding the law and procedures in a death penalty case. The venirepersons then completed a written questionnaire that covered a broad range of general topics such as their residential, marital and employment history, and prior exposure to the criminal process. The court, the prosecution, and the defense counsel then asked supplemental questions.

The court substantially used defense counsel's previously proposed questionnaire and list of questions. One such proposed question was: "Do you know of any reason, such as prejudice, bias, or other opinion, that you can think of that would prevent you from serving as a completely impartial juror in this case?" Although the court posed the above question to several of the first venirepersons, it soon modified the question. The question became: "Do you have any feelings within you

that would prevent you from being a fair and impartial juror in this case?"

Prosecution and defense counsel were afforded substantial freedom in terms of degree and subject matter of direct questioning. Although much of the defense counsel's questioning focused on death qualification, the attorney was given free rein to delve into the potential jurors' racial attitudes. Defense counsel does not deny that he was unhampered in his questioning about racial prejudice or that he made no objection to the court's modification of his proposed question. Nonetheless, the defense claims the ultimate responsibility "for the virtual absence of inquiry into this area" remains with the trial court. Thus defense counsel asserts that the trial court was required to ask more pointed questions about racial prejudice so that he would be put on notice of the need for follow-up on this issue.

Both the United States Supreme Court and this Court have addressed the issue of *voir dire* on racial prejudice. The Supreme Court has held that the federal constitution mandates an inquiry into racial prejudice of prospective jurors only in cases in which racial issues are woven into the very fabric of the case and trial. In *Ham v. South Carolina,* 409 *U.S.* 524, 93 *S.Ct.* 848, 35 *L.Ed.*2d 46 (1973), an African–American civil-rights activist claimed that white law-enforcement officers had framed him in retaliation for his political activities. The Court held that when an African–American requests an inquiry into the racial prejudices of potential jurors, the request should be granted. Justice Rehnquist, writing for the majority, stated that the due-process clause of the fourteenth amendment mandates such an inquiry when racial prejudice threatens to infect trial proceedings. The Court refused to encroach, however, on a trial court's discretion in conducting such an inquiry or the number of questions on the subject of racial prejudice necessary to effectuate the goal of a trial free of racial bias.

The Supreme Court elaborated on its brief holding in *Ham* in subsequent cases. In *Ristaino v. Ross,* 424 *U.S.* 589, 96 *S.Ct.*

1017, 47 *L.Ed.*2d 258 (1976), the Court upheld the trial court's refusal to inquire, during *voir dire,* into the racial attitudes of prospective jurors. The Court explained that *Ham* had not ordered trial courts to inquire into racial attitudes any time that a minority defendant requests it. Instead, due process mandates an inquiry only when "[r]acial issues [ ] were inextrically bound up with the conduct of the trial." *Ross, supra,* 424 *U.S.* at 597, 96 S.Ct. at 1021, 47 *L.Ed.*2d at 264. The mere fact that the defendant in *Ross* was of a different race from that of his victim, did not prove that the trial would involve issues of racial prejudice. *Id.* at 598, 96 *S.Ct.* at 1022, 47 *L.Ed.*2d at 265.

Similarly, in *Rosales–Lopez v. United States,* 451 *U.S.* 182, 101 *S.Ct.* 1629, 68 *L.Ed.*2d 22 (1981), a Mexican–American was tried in federal court for importing illegal aliens. The trial court asked prospective jurors whether they had any "feelings about aliens" or had other reasons that could prevent them from being fair and impartial. The trial court denied defense counsel's requests for more specific questions concerning racial or ethnic prejudice. The Court upheld the trial court's denial on the ground that the federal constitution requires trial courts to grant requests for *voir dire* on the issue of racial prejudice only where there is "substantial indication" that racial or ethnic prejudice will play a role in the case. 451 *U.S.* at 189, 101 *S.Ct.* at 1637, 68 *L.Ed.*2d at 29.

More recently, in *Turner v. Murray,* 476 *U.S.* 28, 106 *S.Ct.* 1683, 90 *L.Ed.*2d 27 (1986), a majority of the Court agreed to overturn a death sentence based on the trial court's refusal to ask prospective jurors about their racial attitudes. The Court held that a defendant in a capital case involving an interracial crime was constitutionally entitled to have prospective jurors informed of the race of the victim and to be questioned on racial bias. *Id.* at 36–7, 106 *S.Ct.* at 1688–89, 90 *L.Ed.*2d at 37. A plurality of the Court expressed the view that the fact that the crime charged involved interracial violence does not alone entitle a defendant to have prospective jurors questioned about racial bias. What tilted the scale in that instance was the broad

discretion given the jury in a death penalty hearing and the grave consequences of improper sentencing in a capital case. The Court, however, stated that a defendant may not complain about the trial court's failure to inquire about racial bias unless the defendant requested such an inquiry. *Id.* at 37, 106 *S.Ct.* at 1689, 90 *L.Ed.*2d at 37.

This Court has also considered the extent to which a defendant is entitled to an inquiry into racial bias of the prospective jurors. Even in cases with no interracial crime or obvious racial overtones, this Court has stated that it prefers a searching inquiry into racial bias, if so requested by defendant. *State v. Ramseur, supra,* 106 *N.J.* at 247–48, 524 *A.*2d 188.

In *State v. Williams,* 113 *N.J.* 393, 550 *A.*2d 1172 (1988), we explained that even in cases in which there are no obvious racial issues, a *voir dire* that includes an inquiry into racial bias may sometimes be appropriate:

> Racial prejudice may be either blatant and easy to detect or subtle and therefore more difficult to discern. A probing *voir dire* that elicits more than a "yes" or "no" response will aid the trial court in excusing prospective jurors for cause and will assist the defense in exercising its preemptory challenges. When the defendant is a member of a cognizable minority group, a more searching *voir dire* should be conducted, if requested.
>
> [*Id.* at 428, 550 *A.*2d 1172.]

Our view of the *voir dire* process acknowledges the fact that jurors may be racially or ethnically biased against the defendant, even in the absence of an explicitly racially divisive factual situation. *State v. Ramseur,* 106 *N.J.* 123, 247, 524 *A.*2d 188 (1987). ("We are sensitive to the reality of racial prejudice, and to the possibility that jurors may prejudge a defendant because of his or her race, even in the absence of an interracial crime.") We have recommended that trial courts inquire into racial bias whenever defendant requests it, but have also recognized the broad discretion trial courts should have to determine the *voir dire* process in ambiguous situations.

Based on this review of the relevant law, we reject defendant's challenge to the *voir dire* procedure. The crime at issue

was not of an interracial nature. It concerned an African–American defendant and African–American victims. The trial court allowed an expanded *voir dire* into the issue of racial bias. Defense counsel informed the Court that he would deal with the issue of racial attitudes directly and was unhampered by the Court in doing so. The trial court asked the jurors whether they knew of any reason (sometimes the court specified the reason as prejudice or bias) that would prevent them from serving as completely impartial jurors in the case. Defense counsel made no objection to that modified question. After the court had asked the jurors that question, it allowed defense counsel full freedom to inquire into the jurors' racial beliefs.

Because the trial court permitted defense counsel's full and unrestricted inquiry, sufficient to unearth any relevant racial bias that could have compromised the integrity of the trial proceedings, we find that the trial court's *voir dire* procedure did not deprive defendant of an impartial jury or a fair trial.

### B. Systematic Exclusion of Prospective Jurors Based on Race and Gender

■ Defendant also argues that the State systematically excluded from the jury minorities and women (the defendant did not raise the gender-related claim below). The prosecutor used eleven peremptory challenges to exclude one Latino and ten African–American venirepersons. Ten of those venirepersons were women.

In *State v. Gilmore*, 103 *N.J.* 508, 511 *A.*2d 1150 (1986), we held that the New Jersey Constitution guarantees the right to an impartial jury. We there discussed the procedure and burden of proof triggered by the allegation of improper use of peremptory challenges. First, a defendant must object prior to the swearing in of the jury to the State's use of peremptory challenges to strike jurors because of their race, ethnic background, or sex. Defendant must then make a *prima facie* showing that the objection has merit:

[T]he party may show that [the State] has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group— and that in all other respects they are as heterogenous as the community as a whole ... [T]he defendant need not be a member of the excluded group ... yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.

[*Id.* at 536, 511 *A.*2d 1150 (quoting *People v. Wheeler*, 22 *Cal.*3d 258, 276, 583 *P.*2d 748, 764, 148 *Cal.Rptr.* 890, 906 (Cal.1978).]

Next, a defendant must establish that the persons excluded are members of a cognizable group that represents a cross-section of the community. Finally, the defendant must make a strong showing that the State was motivated by bias against the challenged group rather than by the juror's personal views. *Ibid.; State v. Watkins*, 114 *N.J.* 259, 553 *A.*2d 1344 (1989).

If defendant succeeds in making a *prima facie* case, the burden then shifts to the State to demonstrate it did not base its peremptory challenges on group bias. The State needs to show a genuine and reasonable ground for believing that a prospective juror might have an individual or personal bias that would make excusing him or her rational and desirable. Where the State does undertake to justify its exercise of peremptory challenges, the trial court must determine whether the explanations proffered by the State are genuine and must weigh those explanations against the showing made by defendant. On that weighing the trial court must then determine whether defendant has rebutted, by the preponderance of the evidence, the presumption of constitutional exercise of the peremptory challenges. *Id.* at 538, 511 *A.*2d 1150.

Defendant objected to the State's use of eleven of twelve peremptory challenges to excuse ten African–Americans and one Latino. The State, in turn, argues that because the percentage of African–American jurors in the sworn jury, five or six out of sixteen (or 31% to 37%) equals or exceeds the African–American population in Essex County of 37.5%, the

defense has failed to establish that the State has disportionately challenged minority groups.

The fact that African–Americans actually served on this jury is not dispositive of whether there was racial discrimination and does not relieve the trial court of the responsibility to ascertain if any prospective juror was peremptorily challenged on a discriminatory basis. It appears that the State did challenge members of racial minorities disproportionately. Indeed, when it turned to the State for an explanation, the trial court implicitly acknowledged that defendant had made a *prima facie* case.

The State first explained that there was no racial issue in this case and that it had excused the jurors because each of them had expressed hesitation about imposing the death penalty. The trial court accepted that rationale, as do we. We find no error in the trial court's decision because the State is allowed to exercise peremptory challenges based on the jurors' personal biases. A juror who expresses qualms about imposing the death penalty possesses an individual view that the State may find antagonistic to its goals at trial.

A review of the State's participation in *voir dire* does not indicate any differentiation from the norm when the excused jurors were questioned. The *voir dire* indicates that the State was most interested in exploring all the jurors' views on the death penalty. That exploration is appropriate and nondiscriminatory in a capital case. Moreover, our review of *voir dire* shows that nine of the eleven jurors did express some hesitancy or reluctance to participate in a death case. With respect to another of the challenged jurors, repeated requests were made to her to speak up. She acknowledged that the whole process frightened her and she was uncomfortable. Thus, we find that even if the State used a significant number of challenges to exclude minority jurors, there is no indication that the reasons the State proffered for the exclusion were pretextual or betrayed subtle or unconscious racism.

The charge that the State also used its peremptory charges discriminatorily to excuse women from the jury was not filed below, as mandated by *Gilmore.* Yet, even if we were to consider the issue, defendant does not advance any convincing evidence that women were excluded from the jury on the basis of their sex. Hence, we conclude that the State did not exercise its peremptory challenges systematically to exclude racial minorities and women from the jury.

### C. Juror Should Have Been Excused Because of Inflexible Belief in Death Penalty

Finally, defendant raises the issue that one juror should not have been seated because he expressed an inflexible belief in the imposition of the death penalty. Because of the importance of a fair jury in the capital sentencing context we consider that issue even though defendant did not object to the seating of that juror during *voir dire.* From the record, it appears that he initially stated a seemingly-unequivocal belief in the death penalty. After being questioned further, however, he expressed the view that he would be able to consider imposing a life term instead of the death penalty, depending on his examination of the aggravating and mitigating factors. Defense counsel did not object to the seating of this juror. We do not believe that his statements indicate that he would have automatically imposed the death penalty, see *Witherspoon v. Illinois,* 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 (1968), or that this juror's views impaired his ability to serve. See *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985); *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980).

## IV. GUILT–PHASE ISSUES

Defendant makes three principal challenges to the guilt phase. First, he argues that pursuant to *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), the trial court's failure in its jury charge to distinguish for capital sentencing purposes between

intent to kill and intent to cause serious bodily injury deprived him of due process of law and subjected him to cruel and unusual punishment. Second, he argues the trial court's failure to distinguish between murder by one's "own conduct" and accomplice-murder liability for capital sentencing purposes deprived defendant of due process and subjected him to cruel and unusual punishment. Finally, defendant maintains that Count Eight of his indictment charged him with more than one offense and that the State also failed to prove that count beyond a reasonable doubt.

### A. Effect of *State v. Gerald*

■ This capital case was tried before *Gerald.* Accordingly, the trial court did not require the jury to distinguish between the intent to cause serious bodily injury and the intent to cause death. However, because of the overwhelming evidence that defendant intended to kill both victims, we find, as we did in *State v. Pitts,* 116 *N.J.* 580, 562 *A.*2d 1320 (1989), that "there was no realistic likelihood of prejudice" resulting from the omission of the *Gerald* charge. In *State v. Gerald, supra,* we held that

[a] defendant who is convicted of purposely or knowingly causing "serious bodily injury resulting in death" under *N.J.S.A.* 2C:11–3(a)(1) and (2), or either of them—as opposed to one who is convicted of purposely or knowingly causing death under those same provisions—may not be subjected to the death penalty. [113 *N.J.* at 69, 549 *A.*2d 792].

Because the evidence in *Gerald* was susceptible of either finding, we reversed defendant's capital murder conviction. However, in *Gerald* we recognized that in some capital murder cases the evidence would be so compelling that there could be no question that the defendant intended the death of his victim. *Id.* at 79–80, 549 *A.*2d 792.

The trial court in this instance, without the benefit of *Gerald,* instructed the jury in accordance with the literal language of the Act, *N.J.S.A.* 2C:11–3(a)(1) and (2), that defendant could be convicted of capital murder if the jury found either that defendant purposely and knowingly intended to cause death or pur-

posely and knowingly intended to cause serious bodily injury resulting in death. Thus, the trial court failed to have the jury distinguish between intent to kill and intent to cause serious bodily injury.

Because the record contains nothing that would support a "serious bodily injury" murder charge, we find that the trial court's failure to give the serious bodily injury charge was not in error.

Defendant's own words demonstrate his intent to kill. Defendant described Walter Bass' death as follows:

> I then cut him across his throat with a knife and he told me: "Tony, don't." Then I stabbed him in the chest. I was holding his neck with my hand. Then I think I stabbed him again two times. He fell on the floor. I told Kisha to watch him.

And, with respect to Maria Bass' death, he describes his subsequent actions:

> I went and got a cinderblock that was in the house and I hit her in the head with it. Maria moved again. Then I hit her with the bat once. Then I took the knife out of Kisha's hand and cut Maria's throat.

Likewise, McDougald's actions after the murder demonstrate his intent to kill rather than to inflict serious bodily injury on the Basses. McDougald related to his mother and later to a neighbor of his mother that he had killed the Basses; he also told his mother that he wanted to kill three more people. McDougald then called the police to inform them that he had killed the Basses and to tell them about where to locate the bodies. In his later confession to the police McDougald never expressed any sentiment to indicate that he had intended merely to hurt the Basses, not kill them. At trial the defense conceded that the prosecution's version of the facts was essentially correct. The extreme severity of the victims' injuries as well as the defendant's behavior before and after the crime present not even a scintilla of evidence to allow us to conclude that he merely struck out at the Basses in a rage but did not intend to kill them. The fact that McDougald was angry at the Basses when he murdered them does not negate the evidence that he intended their deaths.

We have previously considered capital cases in which the evidence compels the conclusion that the defendant intended to kill the victim. *State v. Hunt*, 115 *N.J.* 330, 558 *A.*2d 1259 (1989) (the defendant inflicted twenty-four stab wounds and told someone immediately after the crime that he had killed his victims); *Ramseur, supra*, 106 *N.J.* 123, 524 *A.*2d 188 (the defendant had previously threatened and assaulted his victim, had returned to inflict additional wounds, and had stated his intent also to kill the victim's children).

In *State v. Pitts*, 116 *N.J.* 580, 562 *A.*2d 1320 (1989), the defendant was convicted of killing two persons and sentenced to death for the death of one. We determined that the defendant's statements that he had killed in a rage and did not intend to harm his victims gave rise to a need for a *Gerald* charge. *Id.* at 615, 562 *A.*2d 1320. We examined the record, however, to determine whether the omission of the *Gerald* charge was of material significance. We considered the extremely violent nature of the attack, the fatal wounds on the victims' body, the fact that defendant paused to take the victims' pulse in order to verify their death, and defendant's incriminating statements to a friend, after he committed the murders, that he had cut one of the victim's throat and, thus, given her a "payback." All these facts led us to conclude that "no matter how indulgently the record is read, we cannot conceive that the jury, charged in accordance with *Gerald*, would have concluded that defendant intended to cause [the victim] serious bodily injury, but not death." *Id.* at 620, 562 *A.*2d 1320.

Similarly, an analysis of the record in this case leads us to the overwhelming conclusion that "it would be virtually 'inconceivable' that a jury could have concluded that defendant intended to cause serious bodily injury ... but not death." *Id.* at 620, 562 *A.*2d 1320.

### B. Defendant's Own Conduct Requirement or Accomplice Liability

■ Defendant also questions the sufficiency of the trial court's instruction regarding the distinction between personal

culpability and accomplice liability. Under New Jersey's Capital Punishment Act only those persons who commit knowing and purposeful murder by their *own conduct* are eligible for the death penalty. *See also* Capital Punishment Act: Hearings on S.112 before the Senate Judiciary Committee (1982). In *State v. Gerald, supra,* 113 *N.J.* at 96, 549 *A.*2d 792, this "own conduct" requirement was interpreted narrowly to mean that a defendant must have *"actively and directly participated* in the homicidal act, *i.e.,* in the infliction of the injuries from which the victim died." *Id.* at 97, 549 *A.*2d 792.

In *Gerald,* the defendant had argued that a jury must find that it was the defendant's conduct alone that had caused his victim's death before he could be death-eligible. We rejected such an exclusive causation requirement, explaining that "[t]he 'own conduct' standard seeks to distinguish, for purposes of punishment, guilt premised on defendant's own actions from guilt based on the actions of another ... The critical elements are that the defendant in fact acted, and the immediacy of his conduct to the victim's demise." *Ibid.; see also State v. Moore,* 113 *N.J.* 239, 300–03, 550 *A.*2d 117 (1988) (accomplice liability may suffice for murder conviction, but defendant's own conduct in commission of murder is prerequisite to imposition of death penalty).

As we stated in *Gerald,* it is not necessary to trace every action that could have caused death to determine exactly which injury led to the victim's demise. An autopsy may not reveal to an absolute certainty which injury, among many, killed the victim. More important is the issue of how immediate the defendant's actions were to the victim's death, and whether or not he or she participated in administering the injuries that killed the victim.

The court's charge adequately explained and differentiated between active participation and accomplice liability for murder. Defense counsel did not object to the charge. Additionally, the verdict sheet required that if defendant was found guilty of

knowing and purposeful murder, the jury should check one of two options: murder by his own conduct or as an accomplice. The jury found that defendant committed both murders by his own conduct, a conclusion amply supported by the record.

McDougald participated directly in both killings. He stabbed, cut and struck the victims until they died. His accomplice, Kisha, also struck the victims. Unlike the defendant in *Moore*, however, who was not even present when her accomplice dealt the blows that finally killed a victim whom she had tortured for an extended period of time, McDougald's attack on the Basses was direct, sudden, and unquestionably lethal. Thus, the court's instruction was adequate, and the jury explicitly decided the issue when it marked down on the verdict sheet that defendant had committed the murders by his own conduct.

### C. Count Eight of the Indictment

■ Count Eight of the Indictment reads as follows:

The Grand Jurors of the State of New Jersey, for the County of Essex, upon their oath present that ANTHONY TYRONE MCDOUGALD on the 19th day of August, 1984 at the City of Newark in the County of Essex ... did prevent by means of force Walter Bass or Maria Bass from performing an act or from providing information or testimony which might aid in his discovery or apprehension or in the lodging of a charge of sexual assault or burglary against him contrary to the provisions of *N.J.S.* 2C:29–3b(2)(3), a crime of the Third Degree. . . .

Defendant argues that Count Eight charged him with two distinct offenses, violating his due-process right to notice of the charges against him and depriving him of the right, under the State Constitution, to indictment by a grand jury.

Defendant did not assert that issue below. *Rule* 3:10–2 mandates that with certain specified exceptions, objections to the indictment be made before trial or else waived. In *State v. DelFino*, 100 *N.J.* 154, 160, 495 *A*.2d 60 (1985), we stated that under *Rule* 3:10–2

[t]he failure of timely assertion, even of constitutional rights, may result in [ ] a waiver. *State v. McKnight*, 52 *N.J.* 35, 48 [243 *A*.2d 240] (1968). What constitutes good cause for delay will depend upon the circumstances. * * * Moreover, the merits of the underlying assertion must be persuasive if an untimely challenge is to be otherwise allowed for good cause.

[*Id.* at 160–61, 495 *A.*2d 60].

Defendant has not proposed any good cause for his delay. Because that challenge does not concern directly defendant's capital conviction, we are less willing to suspend procedural bars absent good cause.

■ In addition defendant's underlying assertion is unpersuasive. Count Eight charged the defendant under *N.J.S.A.* 2C:29–3b(2), (3) which criminalizes a variety of actions intended to Hinder Apprehension or Prosecution. *See N.J.S.A.* 2C:29–3. This charge relates to McDougald's alleged motive to kill the Basses in order to preclude them from pursuing charges against him for statutory rape. Although we have previously stated that "separate and distinct offenses cannot be charged in the same count of an indictment," *State v. New Jersey Trade Waste Ass'n,* 96 *N.J.* 8, 21, 472 *A.*2d 1050 (1984), we have also allowed counts to embrace more than one issue when the statute in question addresses several things disjunctively. *State v. Pirone,* 78 *N.J.Super.* 158, 160–61, 188 *A.*2d 45 (App. Div.1963). In this case, *N.J.S.A.* 2C:29–3 proscribes the hindering of prosecution in general, and lists in the disjunctive various specific types of conduct toward this end that are criminal. Thus we are not convinced that Count Eight is duplicitous.

■ Defendant also argues that the State failed to prove Count Eight beyond a reasonable doubt in violation of his due-process rights. We must determine here
> whether viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt. [*State v. Palacio,* 111 *N.J.* 543, 550, 545 *A.*2d 764 (1988) (quoting *State v. Reyes,* 50 *N.J.* 454, 459, 236 *A.*2d 385 (1967)).]

Throughout the trial there were numerous references to McDougald's belief that the Basses wanted him prosecuted for statutory rape and burglary charges. Marilyn Howard, Bernice Simmons, and Antoinette James all testified to defendant's statements that the Basses had pressed rape charges against

him. Furthermore, the jury heard from defendant's own confession that he had repeatedly asked Walter Bass, before killing him, "why was they trying to hurt me ... why, why [?]" We believe that this evidence was sufficient to support a jury finding that McDougald killed the Basses in order to avoid prosecution for other crimes. Thus we reject defendant's argument that the State failed to prove Count Eight beyond a reasonable doubt.

## V. PENALTY PHASE ISSUES

Defendant presents various challenges to the penalty phase of the trial. Because we find that the trial court's charge on aggravating factor *N.J.S.A.* 2C:11–3c(4)(c) involving torture or aggravated battery is defective and warrants a new penalty phase hearing, we address that issue first. Defendant also argues that the trial court erred in charging factors c(4)(f) (murder to escape detection for other crimes) and c(4)(g) (murder while in the process of a felony). In addition, defendant maintains that the trial court erred in instructing the jury regarding mitigating factors.

### A. Aggravating Factor 2C:11–3c(4)(c)

The trial court did not have the benefit of our decisions in *State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188, and *State v. Biegenwald, supra,* 106 *N.J.* 13, 524 *A.*2d 130 (1987), which narrowed the construction of aggravating factor c(4)(c). *See State v. Ramseur, supra,* 106 *N.J.* at 198–211, 524 *A.*2d 188. We noted in *Ramseur* that the introductory language of factor c(4)(c) ("[t]he murder was outrageously or wantonly vile, horrible or inhuman"), "is indefinite beyond anyone's ability to remedy * * *." *Id.* at 199, 524 *A.*2d 188. Thus, we found that "the first part of the provision is rendered nugatory. The resultant construction is that the aggravating factor exists when the murder 'involved torture, depravity of mind, or an aggravated battery to the victim.' " *Ibid.*

In *Ramseur*, we set forth the essence of an appropriate jury charge on factor c(4)(c):

[D]epending on the facts, the jury should be charged—without quoting the statute—that this aggravating factor exists if the murder involved torture, depravity of mind, or an aggravated battery to the victim. Torture or aggravated battery to the victim shall be found if the defendant intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death, "severity" measured either by the intensity of the pain, or the duration of the pain, or a combination of both. Where the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing, the court shall instruct the jury on the meaning of depravity in this specific context. For the defendant who killed for the enjoyment of it, because the victim just happened to be in the area, or for no reason at all, just to kill, society must be able to reserve its most extreme sanction.

[106 *N.J.* at 211, 524 *A.*2d 188 (footnotes omitted).]

Moreover, we held that depravity of mind can be found also from evidence of mutilation of the victim after death. *Id.* at 209–10, n. 37, 524 *A.*2d 188.

The charge in this case, with one minor addition, is substantially identical to the charge we held defective in *State v. Rose, supra,* 112 *N.J.* at 530, 548 *A.*2d 1058. The court added to the charge in *Rose* an explanation that the jury could ascertain aggravated battery "if the means to cause death are found to be so cruel and malicious as to present an [ulterior] motive to inflict suffering and disgrace or serious physical abuse [upon] the victim." The court also told the jury that a finding of aggravated battery required that it must have been purposeful. Although the jurors might have interpreted ulterior motive to be equivalent to intent or purpose and they might have interpreted suffering and disgrace as extreme psychological suffering, the trial court was not sufficiently explicit as to require the jury to make those equations.

We find that even with the trial court's additional language, the charge fails to meet the tests required by *Ramseur* with respect to factor c(4)(c). The charge fails in various respects. It does not delineate clearly that in order to find that the killing involved an aggravated battery, the jury would first have to

find that (1) defendant wanted to cause the victim severe physical pain before death, and (2) the victims in fact suffered the intended severe physical pain.

Moreover, the charge does not ask the jury to analyze the torture factor in accordance with the two-step analysis of intent to torture and torture in fact. The trial court's failure to announce this two-step process may have resulted in the jury interpreting "ulterior motive" to be the equivalent of intent, in the torture-and-aggravated-battery context, or altogether misunderstanding the necessity to ascertain defendant's intent.

Moreover, the definition of aggravated battery is overly broad and all-inclusive, allowing the jury to confuse aggravated battery with aggravated assault and serious bodily injury. Furthermore, the jury may have been confused about the meaning and application of the "aggravated battery" factor. Hence, we conclude that the c(4)(c) charge fails under *Ramseur*, *Biegenwald*, *Rose*, *Hunt*, and *Pitts*, and requires that defendant's death sentence be vacated.

### B. Sufficient Evidence to Resubmit c(4)(c)

We find, however, that sufficient evidence was adduced at trial to support the submission to the jury of the c(4)(c) factor at the new sentencing proceeding. A rational jury could find that McDougald intended to and did cause severe physical or mental suffering to his victims. McDougald slit Mr. Bass' throat and stabbed him. He then left the room and came back to bludgeon him with the bat. It is possible that Mr. Bass endured severe physical pain coupled with the suffering of knowing his wife and step-daughter were in grave danger of being killed. Likewise, McDougald inflicted severe injuries on Mrs. Bass, and his insertion of the bat three inches into her vagina accompanied by his statement "That's for having Antoinette" could have caused her great physical and psychological suffering if she was still able to feel and hear him.

Likewise, the jury may have on remand sufficient facts to infer defendant's intent to torture the Basses before killing

them. Defendant had repeatedly slashed and bludgeoned the victims before killing them. Walter Bass was awake and knew he was dying and that defendant would also probably kill his wife. The jury could surmise that defendant purposely awoke Mrs. Bass with the first blow to the head and wanted her to know from that point on that she was going to die. Although there are facts that could be interpreted to contradict those elements of c(4)(c), there is sufficient evidence to allow the issue to be submitted to the jury on remand.

There is also mixed evidence on the record regarding depravity (e.g., that the killings were purposeless or that there was post-death mutilation). Whether to avenge himself because he believed Antoinette James had caused his wife to leave him, or to avoid prosecution for rape, the State argued that McDougald had a reason for the killings. *State v. Rose, supra,* 112 *N.J.* 454, 548 *A.*2d 1058 (State acknowledged defendant's purpose by its submission of aggravating factor c(4)(f) to the jury and that necessarily precluded the assertion that this was a motiveless killing). The State, in essence, conceded that defendant had a motive for the killings.

It is possible, however, that depravity of mind in the sense of defacing a corpse, could be sustained with respect to the murder of Maria Bass. In *Ramseur* we determined that depravity based on post-death mutilation requires that

> the murderer intend[ed] to do physical damage to a corpse and that when that harm is done the murderer has intended that it be done specifically upon a corpse. Depravity is not distinguished from aggravated battery and torture by that finely drawn line that is the moment of death. Instead, it is distinguished by the distinct mental state that causes a murderer intentionally to damage a body that he *believes* is no longer a live human being.
> [106 *N.J.* at 210 n. 37, 524 *A.*2d 188].

No firm evidence exists that McDougald thought Mrs. Bass was dead when he slit her throat and pushed the bat into her vagina. However, those facts could be seen individually or together as either constituting torture and aggravated battery or else constituting depravity in the form of damage to a corpse.

## C. Double Counting of Aggravating Factors

 Defendant argues next that the State submitted the same evidence to support multiple aggravating factors contrary to *State v. Bey,* (*Bey II*), 112 *N.J.* 123, 174, 548 *A.*2d 887 (1988) and *Rose.* In *Bey II,* evidence of defendant's sexual assault upon his victim established the felony of c(4)(g) and also was the foundation of c(4)(c). Recognizing that "the side with the largest number of factors may have practical advantage before a sentencing jury," yet not precluding the same aspect of defendant's conduct (and the same evidence) from being presented in support of multiple aggravating factors, we resolved the dilemma by requiring the trial court to advise the jury:

> it should not simply compare the number of aggravating factors against the number of mitigating factors, that it is considering the same facts more than once, and that it should be cognizant that the same facts are being used to prove more than one aggravating factor. This result permits the jury to consider the evidence relevant to each aggravating factor and should prevent it from giving undue weight to the number of factors when one aspect of the defendant's conduct supports multiple aggravating factors. [*State v. Bey, II, supra,* 112 *N.J.* at 176, 548 *A.*2d 887].

In this way the jury will be deterred from overemphasizing the quantity of aggravating factors.

Again in *State v. Rose, supra,* aggravating factors c(4)(f) (escaping detection) and c(4)(h) (killing a public servant) were both found by the jury. Defendant had argued that the identical evidence used to make out those two factors enhanced the likelihood that his death sentence was arbitrary, in violation of the eighth amendment. The Court concluded that the jury may have assigned "inordinate weight" to these facts and weighed them twice against the mitigating factors. The failure to instruct the jury under the *Bey II* standard led the Court to conclude that the defendant may have been impermissibly prejudiced and his right to a fair trial compromised to the extent mandating reversal of the death sentence. 112 *N.J.* at 525–26, 548 *A.*2d 1058.

We find this case distinguishable from *Rose* and *Bey II,* because in those cases one practical fact, instead of overlapping inter-related facts, was doing double duty. In this case factor c(4)(g) was supported by the defendant's breaking into the Basses' apartment with the purpose to kill Antoinette James (independent evidence was offered for this at trial and defendant was also convicted for attempted murder). Factor c(4)(f) was supported by defendant's alleged motive of escaping detection for sexual assault and prior burglaries. Finally, factor c(4)(c) focused on the violent and vicious manner in which the defendant killed the Basses.

In addition, the court did explain to the jury that its weighing of the factors was not controlled by numbers, and was not "a mechanical process," but required its careful and considered judgment. Nonetheless, the trial court charge did not expressly warn the jury not to give factors supported by the same evidence undue weight, and to be mindful of that situation. On remand we caution the trial court to charge the jury in accordance with our instructions in *Bey II, supra,* 112 *N.J.* at 176–77, 548 *A.*2d 887.

### D. Aggravating Factor c(4)(g)

Defendant charges that the trial court failed to dismiss or instruct the jury adequately regarding aggravating factor *N.J.S.A.* 2C:11–3c(4)(g), which involves a killing while "in the commission" of one of several enumerated felonies.

The jury had already convicted McDougald of attempted murder of Antoinette James when it considered whether he had murdered her parents in the process of committing another felony. It is plausible that McDougald broke into the Basses' apartment in order to kill Antoinette and, while pursuing the felony of attempted murder, killed her parents instead. This would independently support a c(4)(g) finding. It is also possible, on the other hand, that McDougald planned to kill Antoinette and her parents from the very beginning, so that he did not

murder the Basses in the course of trying to murder Antoinette. That is a question for the jury.

We find there was sufficient evidence adduced to allow factor c(4)(g) to be submitted to the jury at the penalty-phase rehearing. We caution the trial court, however, carefully to instruct the jury on the necessary relationship that must exist pursuant to c(4)(g) between the felony and the murder.

### E. Issues Relating to Mitigating Factors

#### 1. *Burden of proof*

Defendant argues that the trial court imposed an excessive burden of proof during the penalty phase by instructing the jury that the defense must "show" the existence of mitigating factors by reliable evidence. He asserts that the statute requires only that a defendant come forward with any mitigating evidence. The State must then disprove this evidence. The defendant argues that any higher burden on the defense contravenes the federal-constitutional principle that a jury consider " 'aspects of the defendant's character and record and the circumstances of the offense proffered in mitigation.' " (quoting *Lockett v. Ohio*, 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973 (1978).

Defendant confuses the concept of preventing a sentencing jury from considering relevant mitigating evidence with that of the issue of burden of proof. In *Eddings v. Oklahoma*, 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1 (1982), the trial court in determining defendant's sentence had ruled that he could not consider the violent background of the defendant in mitigation. The Supreme Court explained that the rule of *Lockett* mandated that the sentencer consider any relevant evidence offered in mitigation. *Id.* at 113–14, 102 *S.Ct.* at 876–77, 71 *L.Ed.*2d at 11. The Court did not discuss whether a state may impose a burden of proof on defendant in that regard.

In *State v. Zola*, 112 *N.J.* 384, 548 *A.*2d 1022 (1988), the Court considered defendant's argument that the legislature intended

"a capital jury to consider as a mitigating factor any factor for which the defense has presented evidence." 112 *N.J.* at 438, 548 *A.*2d 1022. The Court rejected this contention, explaining that the jury must be permitted to make a qualitative judgment on whether "matters in evidence constitute mitigating factors...." *Ibid.* This was necessary to serve the overriding principle that the jury's verdict reflect a determination that "death is or is not the fitting and appropriate punishment for an individual defendant." *Id.* at 439, 548 *A.*2d 1022.

Contrary to defendant's argument, the decision in *Penry v. Lynaugh,* —— *U.S.* ——, 109 *S.Ct.* 2934, 106 *L.Ed.*2d 256 (1989), does not conflict with *Zola.* There the jury had been precluded from giving mitigating effect to defendant's mental retardation. The Court explained that the eighth amendment requires that a jury be "allowed to consider and give effect to mitigating evidence relevant to defendant's character or record or the circumstances of the offense." *Id.* at ——, 109 *S.Ct.* at 2951, 106 *L.Ed.*2d at 283.

Finally, we should note that the jury failed to find only one mitigating factor, c(5)(d)—mental disease or defect or intoxication that impaired defendant's ability to act lawfully. The defense presented very little evidence that McDougald was intoxicated at the time of the murders. The State rebutted that McDougald was intoxicated. Ms. McDougald testified that her son was "high" on the night of the murders. The State brought out that she had omitted this fact from her statement to police. Also, another resident of the YMCA testified that she encountered defendant subsequent to the murders and had not observed him to be under the influence of drugs. Likewise, no expert testimony was offered to support a finding of a mental disease or defect of a degree necessary to interfere with defendant's ability to follow the law. Moreover, the jury did consider the evidence in this regard, for it found such a defect did exist (factor c(5)(a)). Accordingly, it cannot be said that the jury failed to evaluate and qualify the evidence offered in mitigation.

## 2. *Admission of Defendant's Past Conduct*

██ Defendant contends that under the guise of penalty-phase rebuttal, the Prosecutor elicited improper testimony of his past conduct. One of the mitigating factors the defense alleged was that McDougald was suffering from an extreme mental or emotional disturbance brought about by the departure of his wife and son. The State therefore sought to show that even prior to the murders McDougald had been acting irrationally, and was even suicidal.

In relation to this mental state, as well as the other alleged mitigating factors, defendant called six witnesses. Debra Jones from Mt. Carmel Guild Medical Center testified that defendant came to that facility looking for help because he was "having a lot of problems, [ ] his wife left him, he didn't know what to do, [and] that he tried to commit suicide [by] driving his car into a brick wall...." William Campbell testified that he had witnessed defendant drive his car into a building and then state, "Damn it, I can't even kill myself." During cross-examination, the prosecutor elicited testimony to the effect that Mr. Campbell was a neighbor and acquaintance of defendant's wife—a *different* wife from Bernice Simmons, whose departure purportedly caused the emotional disturbance. Karen Vogel, a hospital social worker, testified to defendant's significant attachment and concern for his premature son. Debra Wilder, a friend of defendant's mother, testified that she encountered the defendant in July of 1984, and that on that occasion he looked "wild" and "scared," believed someone to be following him, and admitted to taking drugs.

The defense next called defendant's mother, Shirley McDougald. As previously indicated in the facts, Ms. McDougald testified at length on direct about defendant's troubled childhood. She also testified to defendant's concern for his son, and his distress on learning Bernice Simmons and his son were not going to return from South Carolina. She stated that this caused him to change, that he began to act irrationally (crying,

"couldn't keep still," "all wound up"), and that at one point he tried to attack her in her room at the YMCA. On cross-examination, the prosecutor inquired about her assertion that defendant tended to fight in school and on defendant's attempt to harm her. Following this, he ventured into the area of defendant's bigamy, asking Ms. McDougald if she had informed Bernice Simmons that her son was already married. Defense counsel objected to that line of questioning as irrelevant. The State responded that it was relevant to Ms. McDougald's credibility, "whether or not [she] was protecting her son by not revealing a marriage that she knew about and allowing him to marry Bernice Simmons knowing that he had already been married." The court allowed the question for this purpose.

The final witness for the defense was an acquaintance of the defendant, Donald Winston, who testified that he had been to the defendant's apartment that summer and (1) had seen many candles lit and (2) had heard defendant chanting and (3) had seen him crying over a crib and (4) had told him he had lashed out by breaking a television. The State then called four rebuttal witnesses, one of whom was Bernice Simmons.

Bernice Simmons testified about her fear of her husband, his threats against her and her family and his prior violent behavior. Her testimony rebutted the defense's assertion—communicated through its witnesses—that McDougald was a changed man the summer he killed the Basses. Bernice had, by her own account, always been afraid of Anthony McDougald. She testified that she married him out of fear because he had told her he had rape charges pending against him in Japan. After denying defense counsel's motion for a mistrial and over defense counsel's objections the Court gave a limiting instruction regarding use of the rape charge in Japan. Although, unlike *Rose*, defendant did not present direct character evidence, these instances of misconduct may be found to have legitimately related both to the change (or absence thereof) in defendant's personality subsequent to the departure of his family, and to demonstrating bias on the part of his mother.

In *Rose,* extensive evidence of the defendant's past conduct was revealed during the penalty phase, including his racially-motivated purchase of a shotgun and threats to use it, incidents of misconduct in school, in the service, and in jail, and numerous acts of physical violence directed at girlfriends. We noted that to the extent this information was relevant and admissible, it was for a limited purpose. The Court observed the appropriateness of a limiting instruction in such a situation, and further commanded the jury to consider only those aggravating factors specified by statute in the penalty phase of a capital case. *State v. Rose, supra,* 112 *N.J.* at 506-07, 548 *A.*2d 1058. The Court stated that

> [i]n the penalty phase of a capital case, the function of the jury has been sharply defined by the Legislature. * * * The jury is not permitted, in its weighing process, to add other evidence of defendant's past conduct to the weight it assigns to the aggravating factors, nor to consider other evidence of defendant's past conduct, except to the extent offered to rebut mitigating factors, as detracting from the weight it assigns to the mitigating factors. [*Id.* at 507-8, 548 *A.*2d 1058].

Because the trial court had failed to instruct the jury of the limited purpose for which it could consider "the abundant evidence of defendant's past conduct," the Court could not conclude that it was not improperly factored into the weighing process. The Court held that in the face of that evidence and because that was a capital proceeding, "the necessity for a careful and precise limiting instruction to this jury was clear and compelling," and that its omission was "prejudicial beyond a reasonable doubt." *Id.* at 508, 548 *A.*2d 1058.

In this case we find that the trial court also should have instructed the jury that to the extent that the information was relevant and admissible, it was for a limited purpose. At the new sentencing procedure, therefore, the trial court should give proper limiting instructions with respect to these comments about defendant's past conduct, and should further caution the jury to consider only those aggravating factors specified by statute in the penalty phase of a capital case.

### F. Prosecutor's Comments

Defendant characterizes numerous comments made by the prosecutor during the penalty phase of the trial as prejudicial error. First, he asserts that the prosecutor, during his opening statement, diminished the jury's view of its sentencing responsibility by continually emphasizing that its function was merely fact-finding. Defendant next argues that the prosecutor improperly inflamed the jurors and diverted them from their sentencing task by "interjecting a greater general issue," that being the protection of society. Also, he points to remarks made during summation about Trenton prison being more of a "hell" if defendant were to be sent there "because he is remorseless." He contends that these references to deterrence, lack of remorse, and threats to the prison community constitute the introduction on nonstatutory aggravating factors into the sentencing decision.

In response to those assertions, the State places great weight on the failure of defense counsel to object to most of these statements and on the curative nature of the court's penalty-phase instructions. It argues that the prosecutor did not trivialize the jury's role, and nonetheless that the court properly explained the significance of their verdict. The State concedes that the comments about protecting society were inappropriate.

Although we find some of the prosecutor's comments to be improper, we note that defense counsel objected only to his reference to Trenton State Prison and his mischaracterization of the mitigating factors as equivalent to the defense of insanity. Moreover, the prosecutor did not have the benefit of our holdings in *Ramseur* and later cases on prosecutorial misconduct. We assume that on rehearing of penalty phase that the prosecutor's comments will be guided by these later decisions.

### G. Dilution of Jurors' Responsibility for Death Penalty

Next, defendant argues that the trial court improperly diluted the jurors' sense of responsibility during its charge at the penalty phase. During the charge at the penalty phase, and

in reference to the verdict sheet the court had prepared, the trial court explained to the jurors:

> If you have checked one or more aggravating factors yes and ... have checked all of the mitigating factors no, then you proceed no further and you return this verdict sheet to the court as your verdict.

That instruction, defendant argues, contravenes the fundamental principle of capital jurisprudence that the jurors must make a "normative judgment that death is the fitting and appropriate punishment." At trial, defense counsel objected to the charge because "it is our position that the jury doesn't need to find any mitigating to recommend a life sentence," and requested that the verdict sheet reflect that option. The court denied the request.

In *Bey II, supra,* we found precisely the same sort of instruction erroneous. We explained that the jury could have believed that its weighing of the factors was merely a mechanical function. The charge could have thus "failed to communicate that the jury, not the mechanics of the statute or the 'law', is ultimately responsible for the imposition of the death penalty." 112 *N.J.* at 164, 548 *A.*2d 887:

> The court should have expressly instructed the jury that a consequence of finding one or more aggravating factors and no mitigating factors meant that the jury thought that the death penalty was a fitting and appropriate punishment for the defendant. Such a charge would have "suitably directed" any belief of a juror about the inappropriateness of the death penalty to one or more mitigating factors. *Gregg v. Georgia,* 428 *U.S.* 153, 189, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976).
>
> [*Ibid.*]

In *Bey II* the jury had failed to find the existence of any mitigating factors and had returned a death verdict. We reiterated that the jury "was not relieved by some statutory scale as the ultimate arbiter of defendant's life." *Id.* We held this, in conjunction with the failure of the trial court to have indicated that the jury did not have to be unanimous in finding mitigating factors, constituted reversible error.

Although the court in this case did not specifically instruct that jury that it must find death to be a fitting and appropriate punishment, it did tell the jury that their determination of

whether the aggravating factors outweighed the mitigating factors to a sufficient degree would result in the sentence of death. The jury found two mitigating factors, and proceeded to engage in the weighing process. While the charge could have been more specifically stated, we do not find that it constitutes independent grounds for reversal of the death sentence.

## VI. ISSUES RELATING TO BOTH THE GUILT AND PENALTY PHASES.

### A. Information Concerning Other Relationships with Women

Defendant argues that prejudicial information concerning his relationships with women was wrongfully admitted at both phases of the proceeding in contravention of *Evidence Rule* 55. In this regard he points to the disclosure that he was "seeing" his thirteen year old co-participant in these crimes, that when he arrived at police headquarters to turn himself in he was accompanied by a "young lady," that he was dating Marilyn Howard during the early months of 1984 while also bigamously married to Bernice Simmons and carrying on a sexual relationship with Antoinette James, and that he had fathered four children. Those he characterized as the introduction of crimes and/or civil wrongs.

Defendant's objection to that information would be more properly based on its prejudicial impact under *Evidence Rule* 4, because those facts were not adduced to give rise to an inference of guilt to the crimes charged. Rule 55 provides that "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but ... is admissible to prove some other fact in issue...." None of those disclosures was made in attempts to prove that defendant had committed the crimes in question, but they were properly presented in relation to other issues. The

determination of admissibility is largely a matter within the discretion of the trial judge. *State v. Allison,* 208 *N.J.Super.* 9, 177, 504 *A.*2d 1184 (App.Div.1985). We find that trial court did not abuse its discretion in allowing the admissibility of these relationships with defendant.

In the course of detailing his efforts to locate the defendant, Detective Eutsey told the jury that he had located Kisha, a young woman defendant had been "seeing." Defense counsel moved for a mistrial based on that information, but the trial court denied the motion, explaining that "I don't see how that prejudices the defendant." The detective also noted that defendant arrived at police headquarters accompanied by another woman. All of those disclosures are generally relevant to the issue of defendant's guilt of the crimes charged. The fact that the co-participant is very young is relevant to whether the defendant acted knowingly or purposefully, and the efforts of Detective Eutsey to locate defendant and his subsequent arrest of Kisha similarly are related to the overall issue of defendant's identification. The trial court validly exercised its discretion with respect to these facts.

Ms. Howard testified that defendant had told her he was having sexual relations with Antoinette James, and that the Basses had pressed rape charges against him. The court held that information that defendant was dating Ms. Howard was relevant to the jury assessment of Ms. Howard's credibility, and that the nature of the relationship was not overly significant.

Evidence of defendant's bigamy was derived from various sources. William Campbell was presented by the defense during the penalty phase of the trial to testify about defendant's suicide attempt, which he said occurred as defendant left the home of his wife, as proof of his despair over the departure of Bernice Simmons and his son. In an effort to show the friendly nature of their relationship and any corresponding bias, the State asked the witness how he knew defendant. Mr. Campbell

explained that they were acquainted through their respective wives. The prosecutor then elicited testimony that the wife Mr. Campbell was referring to was a different woman from Bernice Simmons, and that it was the home of this woman that defendant left immediately before driving his car into a wall. Defense objected to any questioning about the wife. The prosecutor responded that the defense had "put him on to testify that the man came out and drove his car into a brick wall after talking to his wife." The court permitted the questioning. That information was clearly proper to rebut the inference that the suicide attempt was related to Bernice Simmons, as well as to the credibility of the witness. *Evidence Rule* 20 permits any party to examine a witness on any issue relevant to credibility.

Similarly, the State asked Ms. McDougald if she had told Bernice Simmons about defendant's other wife before the two had married. The prosecutor asserted that this issue was relevant to her credibility in showing that "the witness was protecting her son." Later Bernice Simmons testified that Ms. McDougald had in fact told her about the other marriage. The use of this inconsistency in Ms. McDougald's trial testimony is proper. A defense witness is subject to impeachment, and use of prior inconsistent statements is proper. *State v. DiRienzo*, 53 *N.J.* 360, 383, 251 *A.*2d 99 (1969).

Finally, disclosure that defendant had other children was also proper to rebut the extent of his distress over losing his infant son. Defense counsel brought out the fact that Bernice Simmons had given birth to another of defendant's children while in South Carolina. Moreover, the trial court exercised its discretion in determining that these facts were not unduly prejudicial to defendant, and therefore properly admitted. Only where an abuse of discretion is "palpable" will those rulings be disturbed. *Ostroski v. Mount Prospect Shop–Rite, Inc.*, 94 *N.J.Super.* 374, 382, 228 *A.*2d 545 (App.Div.1967).

B. Admission of Photographs

Defendant also objects to numerous color photographs admitted at both stages of his trial. In conjunction with

Detective Conti's testimony at the guilt phase, the State introduced into evidence four photographs of the victims taken at the crime scene. Two of these depicted Walter Bass as he was found on the kitchen floor and two were of the body of Maria Bass as she was found in the front bedroom. The defense objected to the enlarged photographs from the original "eight by ten" size to "fourteen by eighteens," as unduly inflammatory and adding nothing relevant. Further, the defense asserted that, regardless of the size, these photos were unduly prejudicial to defendant and should not have been admitted. The State responded that the enlargement merely facilitated reference to the pictures by testifying witnesses, and that this did not create any unique or additional prejudice. The trial court agreed that the enlargements were not "particularly inflammatory," that the pictures were relevant to the case the State had to prove, whether or not disputed, and that prejudice to defendant did not preclude their admission. All but S–12, repetitious of S–13, were admitted.

Later in the guilt phase, the State offered eight color autopsy photos in relation to the testimony of Assistant Medical Examiner Melczer. The defense strenuously objected to the use of these photographs, alleging that they were highly prejudicial, repetitive of the previously introduced crime scene pictures, and again unnecessarily enlarged. Although the State was precluded from using the enlargements offered (apparently $16 \times 18$s), most of them were nonetheless ruled admissible by the trial court. Two of those photographs showed Walter Bass' head and upper torso. The court admitted those, finding them not unduly repetitious of previously admitted pictures of Mr. Bass as he was found in his home, nor fatally prejudicial, but instead "highly relevant to proving knowing or purposeful murder." Photographs of Maria Bass showed her head, shaved by the Medical Examiners, and the injuries thereon. Her head was propped back which resulted in graphically showing a gaping throat wound. The defense objected to this intervention and

asserted a lack of probative value to these photos. The court held:

\* \* \* \* \* \* \* \*

Again, all of these things are highly relevant to the issue of purposeful and knowing [,] what happened to her at the hands of the person who committed this offense.

I think they obviously have relevance. I think they may be somewhat obviously prejudicial as any such photographs are in a criminal case, but again I don't think they are meant to be inflammatory. They show the injury to the person. Each one of them show a different one. They are obviously necessary for the injury [sic] to make a fair evaluation of the manner this offense was committed and therefore, I will permit them.

I believe that the probative value far outweighs the possible prejudice to the defendant. However, again I would ask the court reporter to mark the smaller photographs because I think they adequately depict the conditions and I don't think it's necessary to have the blowups here.

Finally, two other autopsy photographs showed Maria Bass lying on her back and stomach with the bat protruding from her vagina. The State asserted that this photograph was probative of the effort McDougald exerted in order to insert the bat, "to the point it had to be physically removed by the doctor," and that the underwear had to first be moved. The court found probative value in that these photos showed "what means he had to go through to insert the bat," and again that they were not unduly prejudicial. All the photographs except those which were repetitious were admitted into evidence.

At the penalty phase, the State moved into evidence all of the photographs admitted during the guilt phase, including the photographs that the court had excluded at the guilt phase. Defense counsel again objected to the pictures. The court overruled the objection and found they were probative of aggravating factor c(4)(c) because they proved aggravated battery. The court held that they were relevant and admitted them.

Defendant contests the admission of the photos in both phases of the trial, arguing that they were highly prejudicial, had only "the flimsiest probative value," and that the issues

they went to prove were adequately covered by other evidence. *State v. Walker*, 33 *N.J.* 580, 166 *A.*2d 567 (1960).

The admission of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of a palpable abuse thereof. *State v. Thompson*, 59 *N.J.* 396, 420, 283 *A.*2d 513 (1971). *Evidence Rule* 4 allows the trial court discretion to exclude evidence if it "finds that its probative value is substantially outweighed by the risk that its admission will ... create substantial danger of undue prejudice...." *Evid.R.* 4. To demonstrate such abuse of discretion, the potential for prejudicial information must significantly outweigh the photos' probative worth, to the extent that the jurors are diverted "from a reasonable and fair evaluation of the basic issue of guilt or innocence." *State v. Sanchez*, 224 *N.J.Super.* 231, 251, 540 *A.*2d 201 (1988).

In *Sanchez*, the defendant objected to photographs of the victim that showed close-ups of gunshot wounds to the hand, chest, and face, and broader pictures of the victim on the floor of the kitchen. Defendant argued that the photographs were cumulative, prejudicial and irrelevant. The court explained that although photographs that tend to establish only cause of death are unnecessary where ample testimony of this is also presented, "here the photographs were introduced to show the viciousness of the attack in order to establish purpose or knowledge to support the murder charge as opposed to a manslaughter conviction." 224 *N.J.Super.* at 250, 540 *A.*2d 201. The court further noted that merely because photographs are cumulative does not mandate (or justify) their exclusion. It explained:

> The State had assumed the burden of showing a purposeful and knowing murder, and the fact that the photographs were gruesome in their revelations does not detract from the fact that they were legitimately a part of the State's proof of defendant's criminal state of mind. From them the jury could infer that the attack was performed with such convulsive ferocity that it could only have been the product of a knowing purpose to cause death. [*Sanchez*, 224 *N.J.Super.* at 250, 540 *A.*2d 201 (quoting *State v. Micheliche*, 220 *N.J.Super.* 532, 545, 533 *A.*2d 41 (App.Div.), certif. den., 109 *N.J.* 40, 532 *A.*2d 1108 (1987)).]

In *State v. Bucanis*, 26 *N.J.* 45, 138 *A.*2d 739 (1958), an autopsy photograph of the victim showed exposed abdominal organs and a knife, sponge and other instruments, and also removed organs to one side. We noted the pervasive discretion of the trial court to determine admissibility, but explained:

> [It is presumed] that the trial judge [will] exercise a modicum of sound judicial discretion and exclude any picture that was unusually gruesome or repulsive and had little evidential value, admitting only those which would be of significant assistance to the jury in its deliberations as to the guilt or innocence of the defendant and which were not unduly prejudicial.
>
> [*Id.* at 53, 138 *A.*2d 739].

We held that the photograph in question should have been excluded, but that only when a defendant has been "substantially prejudiced" does it constitute reversible error.

In *State v. Rose, supra,* an autopsy picture showing the entry of the wound was admitted by the trial court during the guilt phase. We cited the general rule that normally the trial court has discretion over these determinations. We held that because of the prejudicial potential and cumulative nature of the evidence, it should have been excluded. We concluded, however, that the error was harmless "in view of the overwhelming evidence of defendant's guilt." 112 *N.J.* at 536, 548 *A.*2d 1058 (erroneous admissions of photographs and physical evidence "not clearly capable of producing an unjust result. *R.* 2:10–2.").

Although the question is very close, we do not find that the trial court abused its discretion in admitting the photographs in either the guilt or penalty phases. The trial court properly considered their size and context and did not admit all the photographs into evidence. In the guilt phase, these photographs were offered to prove that the killings were done knowingly or purposefully. Likewise, in the penalty phase, the photographs were relevant to establish aggravating factor c(4)(c), defendant's intent to cause severe suffering before death or else to show depravity.

## VII. CONCLUSION

The judgment of conviction is affirmed. Defendant's sentence to death is vacated and the matter is remanded to the Law Division for resentencing.

Justice HANDLER has filed a separate opinion concurring in part and dissenting in part.

HANDLER, J., concurring in part and dissenting in part.

In this case defendant was convicted of the murders of Walter Bass and Maria Bass. After a penalty hearing wherein the jury found beyond a reasonable doubt that aggravating factors outweighed mitigating factors with respect to each killing, the trial court imposed dual death sentences. The Court affirms the murder convictions and those for related offenses but reverses the death sentences due to charging errors on aggravating factor *N.J.S.A.* 2C:11–3c(4)(c). I concur in the Court's judgment that defendant's sentences must be reversed.

The Court concludes that there was no rational basis in the evidence presented at trial to support a charge on serious-bodily-injury murder. I believe that the nature of the assaults as well as surrounding evidence involving defendant's relationship with the victims provide a foundation on which a properly-charged jury could rationally have concluded that the defendant's design was to commit grievous bodily injury on his victims while indifferent to the ultimate consequences of his actions. Therefore I believe a *Gerald* charge was necessary and a jury determination on the issue indispensable.

I also disagree with the Court's conclusion that the aggravated battery/torture component of aggravating factor *N.J.S.A.* 2C:11–3c(4)(c) may be resubmitted to the jury at a second penalty-phase hearing. I believe the Court's review of the record to assess the weight of proof presented is too indulgent and deferential to the State, effectively reducing the standard of sufficiency.

Furthermore, I believe it is appropriate in each of the Court's capital cases to reaffirm my position that New Jersey's capital punishment statute violates state constitutional principles. *State v. DiFrisco,* 118 *N.J.* 253, 283, 571 *A.*2d 914 (1990) (Handler, J., dissenting and concurring). I continue to base my differences with the Court on those grounds.

## I.

New Jersey defendants cannot be subjected to the death penalty for murder if their corresponding intent is found to be anything less than knowingly or purposefully to cause death. *State v. Gerald,* 113 *N.J.* 40, 80, 549 *A.*2d 792 (1988). If, within the body of evidence presented at trial, proofs exist that provide a rational basis for a jury verdict of a lesser-included offense, a defendant is constitutionally entitled to have that alternative offered for jury deliberation. *Ibid.; State v. Coyle,* 119 *N.J.* 194, 222–223, 574 *A.*2d 951 (1990); *see State v. Crisantos,* 102 *N.J.* 265, 276, 508 *A.*2d 167 (1986). Our jurisprudence recognizes the supremacy of the principle that trial fairness is dependent on adequate and appropriate instructions to the jury. *See State v. Grunow,* 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986) (" '[The] judicial obligation, to assure the jury's impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence in accordance with proper and adequate instructions, is at the core of the guarantee of a fair trial.' " (quoting *State v. Simon,* 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979)).

The Court's resolution of the *Gerald* problem in this case signals a further retreat from the indispensable constitutional constraints on the institutional infliction of death. This is another in a string of capital cases in which the Court has engaged in the disturbing practice of trivializing and diminishing capital defendants' significant rights to jury charges on lesser-included offenses. *See State v. Rose,* 120 *N.J.* 61, 69–70, 576 *A.*2d 235 (1990) (Handler, J., dissenting); *State v. Hightower,* 120 *N.J.* 378, 424–425, 577 *A.*2d 99 (1990) (Handler, J.,

concurring and dissenting); *State v. Pitts*, 116 *N.J.* 580, 641–50, 562 *A.*2d 1320 (1989) (Handler, J., dissenting); *State v. Hunt*, 115 *N.J.* 330, 403–11, 558 *A.*2d 1259 (1989) (Handler, J., dissenting); *State v. Rose*, 112 *N.J.* 454, 551–62, 548 *A.*2d 1058 (1988) (Handler, J., dissenting). The majority concedes that the lesser-included homicide was not charged because the jury instructions incorporated without distinction intent-to-kill murder and intent-to-inflict-serious-bodily-injury murder. *Ante* at 558–559, 577 *A.*2d at 436–437. Although claiming to adhere to the standards set forth in *Crisantos* for determining when the record contains minimally adequate evidence that necessitates lesser-offense charges, the Court strays into a comparative assessment of the weight of proofs and rejects the necessity for a clear and separate charge on the lesser murder.

The Court recounts the details of the killings contained in defendant's statement and his actions after the murder, including declarations that he had "killed" the Basses. The Court also considers defendant's failure to claim an intent only to harm his victims and defense counsel's concessions of guilt at trial, and concludes that defendant was not entitled to a *Gerald* charge. *Ante* at 558–559, 577 *A.*2d at 437. The Court explains:

> The extreme severity of the victims' injuries as well as the defendant's behavior before and after the crime present not even a scintilla of evidence to allow us to conclude that he merely struck out at the Basses in a rage but did not intend to kill them. The fact that McDougald was angry at the Basses when he murdered them does not negate the evidence that he intended their deaths.
>
> [*Ante* at 559, 577 *A.*2d at 437.]

The Court focuses its attention exclusively on the evidence of intent to kill. Once done, the existence as much as the weight of that evidence blinds the Court to the less prominent but nonetheless existent contrary proof. After concluding that there is no justification for a *Gerald* charge, the Court generates support for its result by giving weight to the evidence in support of the greater charge and then surmising that a jury verdict on the lesser crime would have been " 'inconceivable.' "

Under the Court's approach,

a "rational basis is not established unless a defendant has not only pointed to evidence that could support a conviction on the lesser charge, but also, and quite apart from this, explained why the jury should have credited that evidence by assailing the strength of the evidence of the greater charge." ... [B]ecause the degree to which a jury will believe and weigh evidence is inscrutable, the question of what weight to afford evidence that could be read to support a lesser charge had previously been left to the jury. Rational basis had been established in our prior cases by an existence of slightly more than "a scintilla" of evidence of the lesser charge, not by any assessment of its weight as against the weight of the greater charge.... [T]o the extent the majority's approach require[s] courts both to hypothesize the weight a jury would have ascribed to a lesser charge and then assess the weight of that evidence as against the weight of the greater charge in order to determine whether a rational basis exists to charge the lesser offense, "it departs from all precedent, imposes an unrealistic standard, and usurps the function of the jury."

[*State v. Hunt, supra*, 115 *N.J.* at 405, 558 *A.*2d 1259 (Handler, J., dissenting) (citations omitted).]

The Court in effect has undertaken to combine in one determination the functions of trial court, jury, and appellate court: it finds as a threshold matter no rational basis in the evidence to support the lesser charge; it simultaneously weighs the evidence in favor of the greater charge to demonstrate both the unavailability of the lesser charge and the exclusive existence of the greater charge; and, on review, finds no reasonable prejudice because it is inconceivable that a jury could disagree with its determination.

The record in this case reveals a rational basis for the *Gerald* charge. The State's guilt-phase evidence showed that defendant and the victims were associated primarily through the victims' daughter, with whom defendant had engaged in a sexual relationship despite her parents' objections. The antagonism between the parties as a result of this relationship escalated in the months preceding the murders, particularly when the parents learned of their daughter's supposed pregnancy. Maria Bass twice called the police after defendant had forcibly entered her home, and was heard to say that she was planning to press charges against him related to sexual contact with her daughter, all of which caused defendant anger and anxiety, and for which he vowed to "get" them. About the same time defendant's wife left him and took the couple's newborn son

with her, a traumatic event defendant blamed on the Basses and their daughter.

Defendant's statement, reciting the deadly encounters and the infliction of the various blows on the Basses, supports the proposition that defendant sought to reciprocate for the harm perceived to have been inflicted on him, while unconcerned about results. First he confronted Walter Bass and, coincidental to slashing his throat and stabbing his chest, repeatedly asked why he and his wife were "trying to hurt [him]." As Walter Bass fell to the floor, defendant ceased that attack. At his accomplice's instigation and because Walter Bass had begun crawling out of the back room, he returned and hit Walter with the baseball bat. The assaults on Maria Bass are equally indicative of a vengeful intent to do grave harm. Defendant inflicted a series of blows to Maria Bass' head, slashed her throat, and forced the baseball bat into her body, offering as explanation for the last assault, "[t]hat's for having Antoinette." Likewise, defendant's statements after the murder evidence his recognition only that the victims had died, *not* that death was his conscious objective.

This is not the case where all of the blows are of lethal quality, like the execution-style killing in *State v. DiFrisco, supra,* 118 *N.J.* 253, 571 *A.*2d 914. On this record a jury could conclude that defendant's primary objective was to injure and maim these people in return for the harm he perceived that they had caused him, to inflict physical mayhem on them to the same extent they had caused him to suffer mentally, without concern for whether they lived or died.

There is no dispute that the assaults on the victims were exceptionally brutal and cruel. However, the extent of brutality is not the test of whether or not a rational basis for a serious-bodily-injury charge exists. The spectrum of intent on which the distinction between intent to kill and intent to cause a victim serious bodily injury is too narrow and the difference too subtle to foreclose summarily the option in any case except that

where the evidence unequivocally precludes an inference that the defendant intended to inflict serious bodily injury on his victim while oblivious to or ambivalent about the ultimate result. As the Court admits in *State v. Pennington*, 119 *N.J.* 547, 562–563, 575 *A.2d* 816 (1990):

> The question is not whether a finding of intent to cause serious bodily injury is likely, but whether the evidence provides a rational basis for such a finding. If so, the jury should have been permitted to accept or reject that alternative. Given the inherent ineffability of mental states, the determination of defendant's specific intent is best left to the jury. *Crisantos, supra,* 102 *N.J.* at 284, 508 *A.2d* 167 (O'Hern, J., concurring in part and dissenting in part).

The Court's opinion reveals a fundamental misinterpretation of the "intent" element of serious-bodily-injury murder. That crime entails the intentional infliction of wounds on the victim sufficient to cause death, and carries the maximum penal consequence permitted by law short of capital punishment. Killings involving less culpable, nonintentional mental states are proscribed by other penal provisions, such as the manslaughter provisions. Moreover, the line between practical certainty that death will be the result of actions and purposeful infliction of wounds sufficient to cause death is blurred. Nevertheless, the distinction is of profound consequence. Only the defendant who seeks to kill, as opposed to the defendant who seeks to injure but who is indifferent to the victim's jeopardy, may be sentenced to death. "It is critical, then, that the jury be given a charge that draws the distinction between one who intends the death of another, and is therefore death-eligible, and one who intends to cause serious bodily injury to, but not the death of, the victim." *State v. Hunt, supra,* 115 *N.J.* at 403, 558 *A.2d* 1259 (Handler, J., dissenting).

Another consideration militates strongly in favor of defendant's position. In view of defendant's admitted responsibility for the killings, and his understanding when charged for these crimes that both serious-bodily-injury and intent-to-kill murder were capital crimes, defense counsel's strategy throughout the trial was simply to appear forthright to the jury, in the hope that this would lend credibility to mitigating evidence. The

majority notes that "[a]t trial the defense conceded that the prosecution's version of the facts was essentially correct." *Ante* at 559, 577 *A*.2d at 437. However, defendant must be given the chance to reappraise his defense and marshall evidence in light of the subsequent clarification of the law under *Gerald.* The failure to undertake the presentation of evidence to support serious-bodily-injury murder cannot legitimately or fairly be held against defendant or prejudice his claim for a retrial under proper instructions.

The Court ignores the fact that at trial defendant was necessarily and understandably ignorant of the significant distinction between the two forms of intentional murder. In my view, proceeding under such misinformation cannot be the foundation of harmless error analysis. As I explained in *State v. Hunt:*

> We have held that at the very core of the guarantee of a fair trial in a criminal case is the judicial obligation to assure the jury's impartial deliberations based solely on the evidence and in accordance with proper and adequate instructions. *State v. Simon,* 79 *N.J.* 191, 206 [398 *A*.2d 861] (1979).... Indeed, "so paramount is the duty to insure a fair trial that a jury must deliberate in accordance with correct instructions even when such instructions are not requested by counsel." *State v. Grunow,* 102 *N.J.* 133, 148 [506 *A*.2d 708] (1986); *see State v. Moore,* 113 *N.J.* 239, 288 [550 *A*.2d 117] (1988) (trial court's failure to charge on diminished capacity constitutes reversible error although charge was never requested by defense counsel.
>
> [115 *N.J.* at 408, 558 *A*.2d 1259 (Handler, J., dissenting).]

To deprive a capital defendant retroactively of a lesser included, alternative form of murder which he or she would have been entitled to address and which arguably would have reduced the chance of a death sentence is unconscionable. *See State v. Hightower, supra,* 120 *N.J.* at 425, 577 *A*.2d 99 (Handler, J., dissenting and concurring).

By joining both intent-to-kill murder and intent-to-inflict-serious-bodily-injury murder into one count of the indictment and effectively trying the case as if they were one crime, the indictment in this case "fundamentally misled [and] misinformed the accused as to the crime charged." *State v. Wein,* 80 *N.J.* 491, 496, 404 *A*.2d 302 (1979). This violated defendant's right to be notified of the specific crimes against him so as to

be able to prepare a defense. The indictment in this case distorted the factual elements of the crimes, and thus did not adequately "give [the] 'defendant notice of what he must prepare to defend.'" *State v. Boratto*, 80 *N.J.* 506, 518, 404 *A.*2d 604 (quoting *State v. Lamoreaux*, 29 *N.J.Super.* 204, 207, 102 *A.*2d 68 (App.Div.), *aff'd*, 16 *N.J.* 167, 107 *A.*2d 729 (1954)). On that basis defendant is also entitled to a reversal of his conviction for murder.

## II.

I disagree with the Court's assessment of the sufficiency of the evidence of aggravating factor c(4)(c). The Court acknowledges, as it must, that the instructions on that factor given at this pre-*Ramseur* trial constitute reversible error. The Court identifies the deficiencies in the charge as surrounding the two-prong showing that must be made by the State beyond a reasonable doubt with respect to the synonymous aggravated battery/torture concept. *Ante* at 566–567, 577 *A.*2d 441. In *State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987), the Court held that aggravated battery/torture contemplates an intent antecedent to and distinguishable from the intent to kill—there must be proof that defendant intended to cause his victims *gratuitous* suffering. In other words, the State must prove that, in inflicting the various assaults, defendant had an independent purpose to cause suffering. This was not explained correctly. Such evidence is wholly lacking in this case, however, and thus that component of the factor should also be foreclosed on retrial. *See, e.g., State v. Biegenwald*, 110 *N.J.* 521, 542, 542 *A.*2d 442 (1988).

The Court draws a novel and erroneous distinction between aggravated battery and torture. The former term appears now to describe physical suffering and the latter mental suffering. *See ante* at 565–566, 577 *A.*2d at 440–441. Aside from eschewing such a distinction in *Ramseur* and instead holding that the focus on defendant's intent "eliminates the need for a distinc-

tion between the two statutory terms," 106 *N.J.* at 209, 524
*A.*2d 188, the ordering of the Court's definitional language
would seem to contemplate the reverse:

> Torture or aggravated battery to the victim shall be found if the defendant
> intended to cause, and did in fact cause, severe physical or psychological pain or
> suffering to the victim prior to the victim's death....
>
> [*State v. Ramseur, supra,* 106 *N.J.* at 211, 524 *A.*2d 188.]

The Court goes on to evaluate the sufficiency of the State's
guilt-phase evidence with respect to aggravated battery/torture
and concludes that either aspect may be submitted to a jury at
a subsequent penalty hearing. With respect to Walter Bass,
the Court notes that he sustained various stab wounds and,
after starting to crawl toward the kitchen, was struck with the
bat, and concludes: "It is possible that Mr. Bass endured
severe physical pain coupled with the psychological suffering of
knowing his wife and step-daughter were in grave danger of
being killed." *Ante* at 566, 577 *A.*2d at 441. Likewise, the
Court hypothesizes that the severe injuries inflicted on Mrs.
Bass, along with the accompanying statement, " '[t]hat's for
having Antoinette,' could have caused her great physical and
psychological suffering if she was still able to feel and hear
him." *Ante* at 566, 577 *A.*2d at 441.

The Court focuses exclusively on the nature of the victim's
injuries. What is patently absent from the Court's analysis is a
discussion of any tangible evidence proving defendant's intent.
*See State v. Hunt, supra,* 115 *N.J.* at 414, 558 *A.*2d 1259
(Handler, J., dissenting) (evidence was insufficient to support
the submission of factor c(4)(c) to the jury because "[a]side
from evidence that defendant had fired the shotgun and was
knowledgeable about its capacity to inflict devastating injury,
there was no proof that defendant's intention was to cause [the
victim] pain and suffering, rather than to kill him." (quoting
*State v. Rose, supra,* 112 *N.J.* at 431, 548 *A.*2d 1058)). Con-
cerning defendant's intent, the Court states:

> Defendant had repeatedly slashed and bludgeoned the victims before killing
> them. Walter Bass was awake and knew he was dying and that defendant
> would also probably kill his wife. The jury could *surmise* that defendant

purposely awoke Mrs. Bass with the first blow to the head and wanted her to know from that point on that she was going to die. Although there are facts that could be interpreted to contradict those elements of c(4)(c), there is sufficient evidence to allow the issue to be submitted to the jury on remand.

[*Ante* at 567, 577 *A*.2d at 441 (emphasis added).]

It is clear from that rendition of the evidence that the Court is dealing only in speculative possibilities. It is intolerable to allow a jury to engage in the same speculations to impose a death sentence. A finding based on sufficient facts requires tangible evidence, not vague suppositions. *See State v. Tropea*, 78 *N.J.* 309, 316, 394 *A*.2d 355 (1978). In my opinion there is no such evidence in this case and therefore, as a matter of law, the State may not seek to reestablish the aggravated battery/torture component of aggravating factor c(4)(c). *See State v. Biegenwald, supra; State v. Ramseur, supra*, 106 *N.J.* at 460–61, 524 *A*.2d 188 (Handler, J., dissenting) (citing *State v. Lynch*, 79 *N.J.* 327, 399 *A*.2d 629 (1979).

## II.

The foregoing reasons impel me to concur in part and dissent in part from the Court's opinion.

*For affirmance, vacation and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.