# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3382-23

L.E.O.,

    Plaintiff-Respondent,

v.

A.S.,

    Defendant-Appellant.

_____

          Submitted June 5, 2025 – Decided June 13, 2025

          Before Judges Mawla and Walcott-Henderson.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FV-13-1892-24.

          Berse Law, LLC, attorneys for appellant (Samuel J. Berse, on the briefs).

          Law Office of Steven P. Monaghan, LLC, attorneys for respondent (Kristin S. Pallonetti, on the brief).

PER CURIAM

Defendant A.S.[1] appeals from the entry of a June 13, 2024 final restraining order (FRO) against her in favor of plaintiff L.E.O. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

The parties had a long-term marriage and had been divorced for nearly seven years when plaintiff obtained a temporary restraining order (TRO). The marriage produced one child, who was an adult at the time of the TRO.

Plaintiff's domestic violence complaint alleged defendant committed harassment on April 1, 19, and 20, 2024, and asserted an eight-year history of stalking and harassment. The parties testified at trial and adduced limited documentary evidence.

Plaintiff testified that a year prior to the first predicate act, he paid for an intervention with defendant's family "to try to get [her] help because she has a very volatile relationship[ with her family] . . . and lost most of her relationships [with them]." The intervention was unsuccessful.

On March 31, 2024, the day prior to the first predicate incident, plaintiff met defendant in a public park "pleading with her to . . . get help and that [he] wanted to support her." Defendant had been accusing plaintiff of being involved with Russian organized crime, committing tax fraud, and involving their son in

---

[1] We utilize initials pursuant to Rule 1:38-3(d)(9) and (10).

A-3382-23

it all.  The purpose of the meeting was to show her that none of these accusations were true, to express his concern about her mental health, and explain how the accusations she was making were affecting him and their son.  The meeting ended when defendant "went into a wild rage and left."

On April 1, defendant appeared at plaintiff's home unannounced and "rang the doorbell incessantly."  Plaintiff did not answer the door but knew it was defendant because her car was parked adjacent to his home.  After defendant left plaintiff's home, she sent him forty-two text messages, including expletives, which plaintiff described as "[a] stream of consciousness," regarding plaintiff's female business partner and threatening to call the police and have plaintiff sent to jail.  The parties' marriage ended in part because of an affair plaintiff had with his business partner.  Defendant was angry the business partner was at plaintiff's home and claimed she should not be around their son.

Defendant threatened to have plaintiff incarcerated.  She said she would call the police, FBI, and IRS because of his perceived criminal conduct.  Defendant also claimed plaintiff had broken into her home and planted listening devices; hacked her computer; sabotaged her car; and was tracking her through his iPad, her television, and her Ring camera.  She also believed plaintiff was

3

communicating with her through her Alexa device.  Plaintiff described the texts as "the standard threats that [he has] been getting for years."

On April 19, the texting continued when defendant sent plaintiff twelve texts within a two-and-one-half-hour period.  Defendant enlisted her brother-in-law to dismantle her Ring camera to search for listening devices, and when he failed to find any, defendant began texting plaintiff accusing him of involving the brother-in-law in spying on her.  When plaintiff responded to one of defendant's texts, she responded with eight more texts accusing him of hacking her phone and bugging her.  Defendant's texts also referred to the business partner and the parties' son.

The texting escalated on April 20 and was similar to the day before in content and volume.  Plaintiff described it as "delusional in nature."  Defendant continued texting plaintiff after he received a TRO and approached him in court to tell him she would never stop.

Plaintiff testified he needed an FRO because defendant's conduct has "continued and escalated" and "after six-and-a-half years of divorce [he] simply can't take it anymore.  . . . It's constant."

During cross-examination, defense counsel confronted plaintiff with evidence purporting to show that plaintiff was electronically tracking defendant.

4

However, plaintiff explained that one program was a Bluetooth device that defendant's vehicle utilizes, and the other was a location sharing program on defendant's phone, which showed the location of an old iPad belonging to plaintiff that had not worked in ten years. Plaintiff testified that he told defendant how to remove his iPad's location from her device.

Defendant testified the March 31 meeting in the park occurred because she believed plaintiff was involving their son in a financial crime. She claimed that, at the meeting, plaintiff told her he borrowed money from organized crime. Defendant told plaintiff she was "like a champagne bottle ready to pop. And [she was] about to drive into the next police station [she] pass[ed]." She gave plaintiff "two weeks to write a letter of apology to [their] son for teaching him how to get caught up in the criminal system." The parties did not come to a resolution during their meeting because plaintiff wanted her to say she had mental problems, and she believed they had a "parenting problem."

Defendant reiterated her belief that plaintiff had bugged her residence. She claimed she found a listening device in a smoke detector and had her home scanned four times and has been paying professionals $125 per hour to help combat the hacking of her devices. Defendant asserted one of the computer specialists she hired shared a suite with plaintiff's business partner and

5

deliberately crashed and erased her computer data. She claimed plaintiff controlled her iCloud account and could see messages sent between her and their son.

Defendant explained she went to plaintiff's home on April 1 after she saw his mother, who mentioned the parties' meeting in the park the day before. She then decided to go to plaintiff's home to resolve the dispute, but when he did not appear at the door, she left.

Defendant admitted texting plaintiff after she was served with the TRO. She claimed she misunderstood the restraints and believed they did not control until after the parties appeared in court.

During summations, defense counsel urged the trial judge to find the parties' disputes were domestic contretemps and a parenting dispute. Plaintiff reiterated he had no interest in surveilling defendant and "just want[ed] to be left alone."

The trial judge credited plaintiff's testimony and found defendant not credible. Given the parties' history, the judge found it not credible that plaintiff would have admitted to taking money from organized crime during their meeting on March 31.

The judge also disbelieved defendant's evidence of the alleged bugging of her home. She noted defendant adduced a picture of a device she claimed she found in the smoke detector. However, the judge had "no idea what that was. It could have been part of the smoke detector. There's no testimony otherwise." None of "the people that were with her when she found it" testified to corroborate her claims. No one testified the object was a listening device and "even if it were[,] there's no indication as to how it got there, or that . . . plaintiff in any way got it there." Defendant offered no proof her Ring camera had been hacked. The judge noted defendant had testified plaintiff did not have keys to her house and that defendant had changed the locks.

There was likewise no proof plaintiff had involved the parties' son in a crime. Defendant's testimony "corroborated [plaintiff's] claims that she's making these wild accusations against him without any basis for them and that it's non-stop."

The judge credited plaintiff's testimony showing defendant's behavior was unceasing and that he could no longer bear her threats to report him to the authorities. Defendant's text messages and trial testimony were "non-linear in thought" and corroborative of plaintiff's "point that she is making these demands on him knowingly, and with the intent that it gets a reaction out of him and . . .

A-3382-23

puts him in fear . . . that she's going to report him to police, [and] he's going to jail." The judge concluded defendant had committed harassment and given the history of "continuous accusations and threats to go to the" authorities, the judge could not see defendant "stopping this line of communication . . . unless she's told she has to."

As part of the relief granted in the FRO, based on the evidence presented, the judge ordered defendant to have a psychological examination. She also continued the restraints against defendant's ability to communicate or contact plaintiff's mother, which he had obtained in the TRO.

## I.

On appeal, defendant argues plaintiff did not prove she intended to harass him. Her communications were borne of a sincere belief plaintiff was engaging in criminality and dragging their son into it. Moreover, the parties were mutually texting one another, which does not support a conclusion that defendant was targeting plaintiff for harassment. Also, plaintiff did not establish the need for the protection of an FRO because there was no evidence he feared defendant. She points to the March 31 meeting as evidence he was not afraid of her.

A-3382-23

Alternatively, defendant argues that, if we do not vacate the FRO, we should vacate the provision including plaintiff's mother as a protected party. She asserts there was no testimony or findings as to why the mother was listed as a protected party.

## II.

Our review of a trial judge's fact-finding function is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). A judge's findings of fact "are binding on appeal when supported by adequate, substantial, [and] credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). We will not disturb a judge's factual findings unless "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Rova Farms, 65 N.J. at 484 (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

Deference is particularly warranted where, as here, "the evidence is largely testimonial and involves questions of credibility." Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). This is "because the trial [court] 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court

in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). We accord deference to the Family Part's fact-finding "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Cesare, 154 N.J. at 413.

Pursuant to N.J.S.A. 2C:33-4, a person commits harassment if, "with purpose to harass another," they: "(a) Make[], or cause[] to be made, one or more communications . . . [in] any other manner likely to cause annoyance or alarm; . . . or (c) [e]ngage[] in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." A purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D. v. M.D.F., 207 N.J. 458, 487 (2011) (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)).

A court does "not measure the effect of the speech upon the victim; [it] look[s] to the purpose of the actor in making the communication." E.M.B. v. R.F.B., 419 N.J. Super. 177, 182 (App. Div. 2011) (citing State v. L.C., 283 N.J. Super. 441, 450 (App. Div. 1995)). A purpose to harass may be inferred from the evidence. State v. McDougald, 120 N.J. 523, 566-67 (1990). Common sense and experience may also inform the determination or finding of purpose. State

v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)).

Although a single communication may be sufficient to establish a defendant's liability under the harassment statute, a trial court must, nevertheless, "consider the totality of the circumstances to determine whether the harassment statute has been violated." H.E.S. v. J.C.S., 175 N.J. 309, 326 (2003) (quoting Cesare, 154 N.J. at 404). After finding a predicate act of domestic violence, a trial court must next consider whether "a restraining order is necessary, upon an evaluation of the [factors] set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." J.D., 207 N.J. at 475-76 (quoting Silver v. Silver, 387 N.J. Super. 112, 126-27 (App. Div. 2006)).

Although the trial judge's findings do not indicate whether she found harassment under N.J.S.A. 2C:33-4(a) or (c), we are satisfied harassment was established under both parts of the statute. The evidence in the record showed defendant's communications had no valid purpose other than to alarm plaintiff and that her conduct was a part of the course of conduct designed to alarm or seriously annoy plaintiff. Although defendant couched her communications as

A-3382-23

a concern for the parties' son, he is an adult, and her concerns could have been communicated without threatening plaintiff.

The record supports both plaintiff's testimony that defendant lacked self-control and the judge's conclusions regarding defendant's "non-linear" thinking and erratic behavior. We note that, during defendant's testimony, the judge had to instruct her to sit down on one occasion and separately instructed her to stop staring at plaintiff. The totality of the circumstances, including old scars from the demise of the marriage, which have in part fueled defendant's beliefs about plaintiff since then, convince us there was no answer he could give her when they met on March 31 or afterwards that would have abated her conduct.

"At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims." Hoffman, 149 N.J. at 584. We are satisfied the facts and evidence warranted the entry of an FRO to achieve this basic protection for plaintiff.

Finally, we reject defendant's argument that we should vacate the inclusion of plaintiff's mother as a protected party on the FRO, even though the trial judge made no specific findings why she included her as a protected party.

The New Jersey Domestic Violence Procedures Manual (DV Manual)[2] explains a protected party is "[a] third[-]party that is included under the protections of an active restraining order. The protected party does not need to qualify as a victim in order to be added to the restraining order, however the judge must set forth the reason for the protection." Sup. Ct. of N.J. & Att'y Gen. of N.J., New Jersey Domestic Violence Procedures Manual, § I(A) at 13 (Apr. 22, 2022).

At the outset, we note the TRO, which initially listed plaintiff's mother as a protected party, was entered by the same judge who tried the FRO. Additionally, at trial defendant testified the catalyst for her going to plaintiff's home on April 1 was her chance encounter with his mother at the supermarket earlier that day.

The PDVA was intended "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. In this regard, Family Part judges are afforded the discretion to extend the protections of an FRO to others including "family members . . . or others with whom communication would be likely to cause annoyance or alarm to the victim." N.J.S.A. 2C:25-29(b)(7).

---

[2] The DV Manual is found at
https://www.njcourts.gov/sites/default/files/courts/family/dvprcman.pdf.

A-3382-23

"[I]t is well-settled that appeals are taken from orders and judgments and not from opinions . . . or reasons given for the ultimate conclusion." Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001) (citing Heffner v. Jacobson, 100 N.J. 550, 553 (1985)). We review orders, not opinions. Ibid.

Pursuant to these legal principles and the circumstances of this case, it was reasonable for the FRO to continue to include plaintiff's mother as a protected party. Given that a chance meeting led defendant to commit a predicate act of harassment and its sequalae, it was necessary to extend the FRO's protections to plaintiff's mother to protect plaintiff.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3382-23